**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Mario RAINONE and Rocco Circelli, Defendants-Appellees.**

No. 78–1820.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 13, 1978.

Decided Nov. 9, 1978.

Rehearing Denied Dec. 19, 1978.

G. Roger Markley, U. S. Dept. of Justice, Chicago Strike Force, Chicago, Ill., for plaintiff-appellant.

George B. Collins, Chicago, Ill., for defendants-appellees.

Before PELL, Circuit Judge, NICHOLS, Judge,* and SPRECHER, Circuit Judge.

SPRECHER, Circuit Judge.

The issue presented in this case is whether a "stop and frisk" performed by a police officer under the conditions set out by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), may properly be extended to a limited search of the vehicle in which the suspect was riding. We conclude

---

* Honorable Philip Nichols, Jr., Associate Judge, United States Court of Claims, is sitting by designation.

that, in the circumstances presented by this case, it may and accordingly reverse the district court's order granting the defendants' motion to suppress.

## I

At approximately 3:00 a. m. on the morning of January 17, 1978, two deputy officers of the DuPage County Sheriff's Office, David Swenson and Dennis Guzlas, observed a car with its headlights extinguished proceeding slowly through a parking lot next to a pizza parlor known as Mario's Pizza. The pizza parlor was closed, and, except for some illumination from a nearby used car lot, the parking lot was dark. The deputy sheriffs drove into the parking lot to investigate these obviously suspicious circumstances. They were followed by a squad car driven by Officer Gene Stack, from the West Chicago Police Department, who happened to be cruising in the area.

All three officers left their squad cars and approached the suspicious vehicle. Stack went to the driver's side; Guzlas and Swenson went to the other side. Guzlas asked the occupants of the car, defendants Circelli and Rainone, for identification and an explanation of their presence in the parking lot. Although both gave their names, only Circelli, who was seated in the driver's seat, could produce any identification. The explanation for their unusual behavior given to Officer Guzlas is in dispute. Guzlas testified that the defendants told him that they were related to the owner of the pizza parlor and were supposed to meet him in the parking lot. Defendant Rainone testified, on the other hand, that he told Guzlas that while en route home he had seen lights on in the pizza parlor and told Circelli to pull into the parking lot so that they could see whether his uncle, who often stayed late preparing for the next

day, was there, in which case he would show Circelli the restaurant. At this point, Stack, having heard Rainone say he was related to the owner of the pizza parlor, told Guzlas that the owner of the parlor was involved in an intra-family feud, that there had been some threats of violence and thus that "there may be some danger involved here with these particular individuals due to the circumstances within the family." (Transcript, April 4, 1978, at 76).

Guzlas then ordered the defendants out of the car. Both defendants were given "pat-down" searches, and nothing was found. Officer Guzlas then left Rainone at the back fender of the car, where he had searched him, and engaged in a quick search of the car, glancing at the front seat, the back seat and the floor of the passenger compartment. Seeing nothing, he placed his hand under the front seat and felt an object which he thought at first was a billy club or night stick. Upon removing the object he discovered that it was instead some dynamite and a detonation device. Both defendants were then immediately arrested. Subsequently the Grand Jury returned a two-count indictment charging the defendants with possession of an unregistered destructive device and with a conspiracy to destroy the pizza parlor.

The defendants moved to suppress the evidence of dynamite possession. The district court found that the original stop of the car was a proper "investigative seizure," reasoning that the officers' reasonable suspicion of criminal conduct satisfied the Fourth Amendment, even though that suspicion would not have constituted probable cause to arrest. Similarly, the pat-down of the defendants was scrutinized under the standards set forth in *Terry* and was found to have been constitutionally permissible given the officers' reasonable belief that the defendants might have been armed.[1]

---

1. The district court held that this belief could reasonably be founded on the facts that it was late at night, that one suspect had no identification and that the suspects' explanation for their behavior was inadequate. Although these facts certainly lead to a reasonable suspicion that the men were likely to be engaged in criminal ac-

tivity, it does not lead to the conclusion that they were likely to be armed. It is equally likely that the defendants were engaged in an illicit activity, such as the use or sale of drugs, where weapons are usually not involved. The record, however, supplies two additional crucial facts which support the reasonableness of the

The district court, however, declined to extend this rationale to permit a search of the vehicle itself. Although the court admitted that it was impressed by the reasons of the officer in making the search of the automobile, it felt that *Terry* was not subject to such an extension since its rationale—the protection of the investigating officer—was satisfied by the pat-down. Accordingly, the motion to suppress was granted, and the government appeals this order under 18 U.S.C. § 3731 (1976). The district court's determinations that the automobile stop and the frisk of the defendants were permissible have not been challenged. The issue before us is limited to the validity of the search of the automobile.

## II

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court announced a principle designed to accommodate the constraints of the Fourth Amendment to the protean variety of investigative encounters between police and ordinary citizens. That decision subjected the police officer's decision to detain momentarily a suspect for investigative questioning to a standard of reasonableness, a standard lower than that of probable cause to arrest. Given a legitimate detention under this standard, the Court permitted police officers to engage in a search for weapons on the person of the suspect "where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for the crime." 392 U.S. at 27, 88 S.Ct. at 1883.

The issue here, however, is not whether the investigative stop and pat-down of the

defendants was justified under the standards set out in *Terry* but is whether the scope of this search could be extended to the nearby automobile in which the defendants had been riding and to which they would return. The guidelines for the permissible scope of a protective search are clearly set out in *Terry.* Since the sole rationale for the search is the discovery of weapons, the search "must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs or other hidden instruments for the assault of the police officer." 392 U.S. at 29, 88 S.Ct. at 1884. The search of the pedestrian in *Terry,* accordingly, was permissible because it consisted solely of a pat-down of the outer clothing of the suspect and thus was "confined . . . strictly to what was *minimally necessary* to learn whether the men were armed. . . ." 392 U.S. at 30, 88 S.Ct. at 1884 (emphasis added).

■ Obviously in a sidewalk encounter with a pedestrian, such as occurred in *Terry,* the officer's need to protect himself from dangerous weapons is fully satisfied by a pat-down of outer clothing of the suspect. However, where the suspect is driving an automobile, a pat-down of the outer clothing may not be sufficient to assure the safety of the police officer. In those cases there is the real possibility that a weapon may have been secreted in a part of the automobile readily accessible to the suspect. This is particularly true where the suspect remains in the car,[2] but is also true even where the suspect has been removed from the car. In the latter instance there is still a risk that the suspect may break away or that he may have a motive to kill the officer even after returning to his car.[3]

belief that the defendants were armed: first, the defendant's claim that he was related to the restaurant owner and, second, Officer Stack's report that the owner had been engaged in intra-family feuding marked by threats of violence.

**2.** It should be noted that several authorities on police procedure recommend that, for the safety of the investigating officer, the suspect not be allowed to leave the car. *See* V. Folley, Police Patrol Techniques and Tactics 95 (1973);

A. Yount, Vehicle Stops Manual, Misdemeanor and Felony 2-3 (1976). *See also Pennsylvania v. Mimms,* 434 U.S. 106, 119-20 n.10, 98 S.Ct. 330, 54 L.Ed. 331 (1977) (Stevens, J., dissenting).

**3.** This would be the case where the defendant has engaged in criminal activity which he believes will be later discovered. Since the police officer, motivated by his suspicions of such conduct, has learned the suspect's identity, he will often be able to connect the suspect to the

Thus, it is clear that the rationale of *Terry* —the protection of the investigating officer and others nearby—permits the officer to make a search of the automobile, limited to what is minimally necessary to uncover weapons to which the suspect will have easy access.

■ The scope of the search in the case before us was clearly restricted to these permissible limits. Officer Guzlas merely looked inside the car and placed his hands under the front seat. He did not open the trunk or the hood or look under the back seat or chassis. Further, Officer Guzlas removed the object from under the front seat only after determining that it felt like a weapon such as a billy club or night stick.

Only three other cases have discussed the applicability of the *Terry* rationale to automobile searches incident to a momentary detention not leading to a custodial arrest.[4] The first of these is *United States v. Green,* 151 U.S.App.D.C. 35, 465 F.2d 620 (1972). In *Green* the police observed the defendant's vehicle travel at an excessive speed and run a stop sign. As a result the officers pursued the vehicle to make a routine traffic stop. As they approached the vehicle they noticed the defendant making "furtive gestures" which gave them the impression that he was armed. After stopping the vehicle, the defendant was ordered out of the car, whereupon he was frisked. Thereafter one of the officers reached under the driver's seat of the car and recovered a fully-loaded pistol. The court upheld the admissibility of the pistol into evidence. It reasoned that the furtive gestures had given the police officers sufficient reason to believe that the suspect was armed and that therefore a protective search was justified under the *Terry* rationale. As to the extension of the scope of the search to include the automobile, the court stated that the protective purposes of *Terry* permitted the search to extend to areas within the immediate control of the driver. The court then noted:

> [t]he search conducted in the instant case was sufficiently limited in scope to satisfy constitutional requirements. The officer first conducted a limited "frisk" for weapons upon the person of appellant. He then went to the car and recovered a fully-loaded pistol from under the driver's seat where he reasonably expected it to be. The officer did not search the trunk, glove compartment or back seat. His search was not general or exploratory, but rather limited to the danger at hand. The search under the driver's seat of an open-door vehicle to which the driver will return is a search of an area under the immediate control of the driver.

465 F.2d at 624–25. Finally, the court responded to the defendant's argument that a suspect who had been permitted to return to the car would pose no danger to the police by pointing out that there was always the likelihood that the suspect will escape and return to the car. The similarities of *Green* to the case before us are striking: in both cases the automobile

---

later-discovered crime, thereby providing the motive for the suspect to eliminate a potential witness.

**4.** The government cites numerous cases involving custodial arrests, *e. g., United States v. Thweatt,* 140 U.S.App.D.C. 120, 433 F.2d 1226 (1970); *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *United States v. Moore,* 180 U.S.App.D.C. 227, 554 F.2d 1086 (1976). Since the Supreme Court has apparently held that automobiles driven by arrestees may be searched under the rubric of searches incident to arrest, these cases are inapposite. *See Adams v. Williams,* 407 U.S. 143, 149, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

The defendants cited, in oral argument, *United States v. Stevie,* 23 Crim.L.Rep. (BNA) 2489 (8th Cir. August 15, 1978). This case also involved a search incident to a custodial arrest. In that case the court applied the prohibition of *Chadwick v. United States,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), against searching an arrestee's luggage without a warrant where the luggage is in the exclusive control of the searching officers. We think the factor of the arrest in *Stevie* sufficiently distinguished this case. Even if it did not, however, certainly the level of control was different in the two cases. Since the defendants were to be returned to the car, the car was not in the exclusive control of the officers in the same manner that the luggage of the arrestees in *Chadwick* and *Stevie* was.

search was preceded by a frisk of the driver who had been removed from the car and was limited in scope to discover only weapons within the easy access of the defendant. Thus, this case is persuasive authority for the extension of a *Terry* frisk to the nearby automobile.[5]

However, one of the other cases, *Government of Canal Zone v. Bender,* 573 F.2d 1329 (5th Cir. 1978), refused to allow the automobile search. Nonetheless, that case is readily distinguishable. In *Bender* two officers of the Panama Canal Zone Police noticed a car with its interior lights on parked in a remote area that had been a frequent site of drug use. Approaching the car, the officer asked the occupants what they were doing. The occupants replied that they were enjoying the view. Apparently there was no view of the Canal from the car, and thus the occupants were ordered from the car. The car was immediately searched for weapons and, although no weapons were found, a frisbee containing marijuana was retrieved from under the front seat. The Fifth Circuit reversed the defendants' conviction on the ground that the automobile search could not be justified by *Terry.* The court pointed out that neither defendant had been frisked prior to the automobile search, thereby completely defeating the protective rationale of *Terry* and thereby dispelling the possibility that the officers were indeed searching for weapons.

Although this fact effectively distinguishes *Bender* from the case before us, the remainder of the court's rationale is important to our discussion. The court noted that the officers had positioned themselves between the defendants and the car. Accordingly,

[a]ny weapon which might have been hidden in the car would have been outside the reach of either suspect and could not have presented a danger to the officers while they were conducting their investigation. To allow the scope of a *Terry* search to extend outside the area of immediate control would be to sever the *Terry* exception from its rationale.

573 F.2d at 1332. Initially it should be pointed out that the court agrees that a *Terry* frisk is not limited to the pat-down of the outer clothing but extends to the area within the suspect's immediate control. The court, however, adopts what we believe to be an overly narrow view of immediate control. As we noted earlier, the car may come within the immediate control of the suspect if he makes an escape attempt, and it certainly will come within his immediate control when he is returned to it.

In conclusion, we do not view *Terry* searches as necessarily restricted to the outer clothing of the suspect. Instead, we hold that the scope of a legitimate *Terry* search may be extended to include areas within the immediate control and ready access of the detained suspect. The record before us indicates that the contested search was confined to such an area—in this instance, the surface of the front and back seats as well as under the front seat. Thus, given the uncontested legitimacy of the "stop and frisk" of the defendants, the search of the automobile was permissible. Accordingly, the dynamite discovered in that search should have been admitted.

Reversed and remanded.

---

**5.** *See also United States v. Wilkerson,* No. 77-1932 (D.C.Cir. July 26, 1978), which permitted a protective *Terry* search to extend to the suspect's automobile. The court noted:

It takes little imagination to realize that an armed suspect might hide his weapon in a car before getting out in response to a police order. Thereafter standing next to the car without handcuffs, either the driver or one of the passengers could have bolted to it, seized a weapon and fire before the officers could find cover.

Slip op. at 8. This rationale is obviously applicable to the case before us, particularly given that here, as in *Wilkerson,* there were multiple suspects, unhandcuffed, in proximity to the car.