UNITED STATES of America, Plaintiff,

v.

Joseph James PILLO, Defendant.

Crim. No. 81–00011.

United States District Court,
M. D. Pennsylvania.

July 10, 1981.

Gordon A. D. Zubrod, Asst. U. S. Atty., Scranton, Pa., for plaintiff.

A. Charles Peruto, Sr., Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

### I. INTRODUCTION

During the evening of January 14, 1981, agents of the United States Drug Enforcement Administration ("DEA") arrested Joseph James Pillo after they allegedly discovered an unregistered firearm and approximately eight pounds of methamphetamine in his automobile. Nine days later, the grand jury returned an indictment charging the defendant with the violation of three criminal statutes: (1) 21 U.S.C. § 841(a), possession of a controlled substance with an intent to distribute; (2) 26 U.S.C. § 5861(d), possession of an unregistered firearm; and (3) 18 U.S.C. § 924(c)(2), commission of a felony while carrying a firearm unlawfully. Pillo subsequently moved to suppress any evidence taken from his car on the ground that the search transgressed the Fourth Amendment. On April 7, 1981, this court held an evidentiary hearing on the question. Analysis of the facts and relevant case law requires that the motion be granted in part.

In December 1980, an individual named Rodriguez voluntarily approached the office of the United States Attorney in Philadelphia and offered information concerning a narcotics crime ring.[1] He explained that he was personally involved in a clandestine operation based in Hunter, New York, in which methamphetamine was produced and disseminated. Rodriguez named a number of his co-conspirators, including defendant Pillo, who supposedly acted as the "main distributor" of the enterprise.[2] The informant claimed that his group primarily marketed the drugs in Philadelphia. DEA Agent William B. Kean was assigned to the case, and he quickly investigated Rodriguez's story. These efforts soon yielded encouraging results.

On January 8, 1981 Kean traveled to New York in an attempt to discover the covert laboratory which produced the methamphetamine. Together with fellow Agent Richard A. Fekete, he approached the Hunter Mountain Ski Resort, which, according to Rodriguez, housed the illicit activity. The investigators, however, could not get close enough to the building to observe the operation through the windows.[3] Thus, the surveillance had to be delayed.

Subsequently, Kean received items of information which indicated that the narcotics ring was planning a major shipment in the near future. First, Rodriguez stated that Pillo, the "main distributor," intended to leave Hunter for Philadelphia around the middle of January. Other supposed members of the conspiracy, moreover, began shifting their locations.[4] Wadelich, Terrance, Duffy, and Gall, all of whom resided

---

1. The informant was not under investigation by the federal authorities when he came forward with his story.

2. Rodriguez stated that the following individuals were also involved in the plot: Steve Zagnojny, John Gall, Jeffrey Terrance, George Wadelich, Howard Duffy, Ronnie Martin, and Dennis Boyce. In addition, there were two men whose first names are not in the record, McDonough and Webster. Finally, Pillo's sister and certain other anonymous persons supposedly had some role in the scheme.

3. At the evidentiary hearing, Kean explained that there was snow on the ground, and footprints close to the resort might have alerted the group to the investigators.

4. In his testimony, Agent Kean stated that he submitted inquiries to other federal law enforcement agencies concerning the various individuals that Rodriguez placed in the cabal. Apparently, there was a general suspicion that certain of these individuals were involved in methamphetamine traffic. Also, Agent Fekete had viewed a videotape in which Gall had negotiated a narcotics purchase with an undercover narcotics agent. Such reputation evidence may be taken into account in assessing the existence of probable cause. *United States v. Harris*, 403 U.S. 573, 581–83, 91 S.Ct. 2075, 2080–81, 29 L.Ed.2d 723 (1971) (plurality opinion).

in Philadelphia, could not be located. Martin, another Philadelphian, appeared to be in Hunter. Kean also listened in on a phone conversation that Rodriguez placed on January 12th to Zagnojny, who controlled the rooms at the ski resort allegedly used to conceal the laboratory. The informant asked if he could use the premises on the subsequent weekend. Zagnojny responded that the lodgings were not available because "people would be working there." Kean then requested the New York Police to join in surveillance of the resort. The local authorities agreed and later informed him that they had observed an automobile registered to Wadelich at the premises.

Early in the morning of January 13th, Rodriguez, Fekete, Kean, and a support unit from the Philadelphia DEA office established an observation post near the suspected laboratory. They saw several parked vehicles, including a Trans Am registered to Pillo. At approximately 7 a. m., Wadelich and an unidentified individual drove up to the building and entered. The investigators could not see inside the building, because the windows were covered with blankets or sheets. No other activity occurred at the site throughout the following day. The agents maintained their watch throughout the remainder of the day.

The next morning, at 9:30 a. m., four individuals emerged from the resort, viz., Martin, Duffy, Terrance, and Pillo. Wadelich remained inside. This development corresponded with Rodriguez's information; he had claimed that during the production of methamphetamine, members of the combine who left the resort traveled in groups and one person stayed behind for security reasons. The four suspects went to a resort for breakfast, where they were observed by an agent at the adjacent table. They subsequently returned to the apartment. Kean then determined that the time had come to request a search warrant. He contacted the local police and requested them to initiate the proper procedures.

The warrant did not arrive during the afternoon of January 14th. At 3:30 p. m.,

three of the persons under observation again exited the building. Pillo stepped into his Trans Am and took off in one direction. The other two suspects headed toward a different route. A federal surveillance unit followed Pillo; the New York Police pursued the alternate group. The federal task force consisted of two vehicles, one manned by Agent Kean and another piloted by Agents Fekete and Reed. The two individuals followed by the state authorities soon returned to the resort. Pillo, on the other hand, proceeded across the New York border into New Jersey. Subsequently, he entered Pennsylvania and traveled westward on Route 80. Kean, Fekete, and Reed continued their pursuit, hoping to find a location at which they could complete their investigation and, if probable cause arose, search Pillo and any of his confederates they encountered en route.

After they had pursued the defendant for approximately three hours, the federal task force began to experience difficulties. First, Kean feared that the longer his contingent followed the suspect, the more difficult it would be to conceal their activity. This problem was magnified after nightfall, because one of the headlights on the Reed-Fekete vehicle burned out, thereby creating a real danger that Pillo would spot their continued presence in his rear view mirror. Kean believed that the Trans Am might be "souped up" and, thus, be able to evade the pursuers if they were noticed. Consequently, Fekete and Reed were directed to maintain a considerable distance behind Pillo and to apply their high beams occasionally. Second, the federal vehicles were running low on fuel, and the defendant showed no signs of stopping at a gas station. Finally, Pillo began to take the agents in an unanticipated direction. Initially, Kean believed that the suspect would head toward Philadelphia, the cabal's alleged market. In that event, the investigators could have called in support units from their home base. Pillo, however, turned off Route 80 and proceeded along Route 115. Kean surmised that the defendant might be traveling toward Lake Harmony, Pennsylvania, the home of Steve Zagnojny. At any rate, the federal

team found itself in unfamiliar territory and, for that reason, their fears of losing the suspect increased. The pursuers decided to make an investigatory stop.

The agents placed magnetic red lights on top of their cars. Kean pulled ahead of Pillo in order to restrict forward movement, while his companions cut the defendant off from the rear. The suspect pulled to the side of the road, and the investigators followed. At the shoulder of the highway, Pillo threw his Trans Am into reverse. He was stopped when he hit the car operated by Fekete and Reed. Using a flashlight, Kean exhibited his badge and ordered the suspect to leave the Trans Am. The actual examination of the automobile was conducted by Fekete. Kean, however, did sense "a strong chemical odor emanating from inside [Pillo's] vehicle" which resembled methylamine, an ingredient used in the production of methamphetamine.[5]

Fekete then made two observations which convinced him that he had probable cause to search the Trans Am. First, Rodriguez had said that Pillo would be armed with a pistol placed between the driver's seat and the console. Fekete could see the weapon as soon as the defendant emerged from the vehicle, because the whole end was exposed. The gun was seized.[6] Second, the agent smelled the same odor of methylamine sensed by Kean.[7] On the basis of these observations, he initiated a full-scale search.

Pillo had an opened leather carry-all in the back seat, and a sweater protruded

from the case. Fekete seized the garment, which bore the odor of methylamine. The agent also discerned a small quantity of marijuana on the console between the seats. Fekete opened the trunk and found two boxes made of translucent white plastic.[8] The investigator noted that the packages were sealed with "duct" tape. Furthermore, he could see that they contained blue crystalline tablets. These latter two points were significant. Fekete knew from experience that traffickers in methamphetamine often used duct tape and blue crystalline tablets in transporting contraband, since these items tend to retard the smell of methylamine.[9] He opened the boxes and discovered approximately eight pounds of methamphetamine. Kean then placed Pillo under arrest. With the assistance of the Pennsylvania State Police, the federal agents took the defendants into custody.

A warrantless automobile search must have two attributes in order to satisfy the Fourth Amendment. Initially, the investigators need probable cause to believe that the vehicle carries evidence or contraband. Second, the exigencies of the situation must be such that the authorities are unable to obtain a warrant in time to effect the search. *United States v. Walden*, 578 F.2d 966, 971 (3d Cir. 1978); *Williams v. Scranton City Police Department*, Civil No. 80–0635, slip op. at 2 (M.D.Pa., May 14, 1981). *See also United States v. Shaefer, Michael & Clairton Slag, Inc.*, 637 F.2d 200, 203 (3d Cir. 1980). In the present case, there is no question concerning the latter

---

**5.** At the time of Pillo's arrest, Kean had served more than ten years at the DEA, during which time he had participated in between eight and ten raids on methamphetamine laboratories. Based on this experience, he was familiar with the smell of methylamine, which has "a very pungent odor ... on the lines of ... ammonia." *See* the Hearing Transcript, Document 19 of the Record at 27–28.

**6.** The indictment described the weapon thusly: "7.65 mm automatic pistol, made P. Beretta, model Brevettata Gardone, serial # 496478." The firearm was allegedly unregistered.

**7.** Fekete was a fifteen-year veteran of the DEA, and, like Kean, he had experience in investigating methamphetamine crimes. At the hearing,

Fekete also testified that methylamine has a distinctive scent when it reacts with aluminum foil. The agent claims that he detected the smell in Pillo's vehicle.

**8.** At the hearing, counsel for the United States characterized the containers as "Tupperware type boxes," and Fekete accepted the description.

**9.** Indeed, the agent testified that "Tupperware type" boxes are themselves very popular among individuals in the methamphetamine trade.

issue. Although the Government had been investigating the Hunter Mountain Ski Resort operation for about a month, both sides agree that probable cause to search the Trans Am did not arise before the day of the seizure.[10] The authorities had no reason to believe that Pillo's vehicle was carrying the anticipated methamphetamine shipment until they saw it drive away from the suspected laboratory. Probable cause, if it existed at all, developed after the vehicle was en route. Thus, the mere failure to obtain a warrant did not taint the search. *Chambers v. Maroney*, 399 U.S. 42, 48–52, 90 S.Ct. 1975, 1979–81, 26 L.Ed.2d 419 (1970); *United States v. Milhollan*, 599 F.2d 518, 526 (3d Cir. 1979); *United States v. Vento*, 533 F.2d 838, 866–67 (3d Cir. 1976). The court shall turn to the question of probable cause.[11]

## II. PROBABLE CAUSE

In determining whether the agents had probable cause to search the Trans Am, the pivotal inquiry is whether they had "trustworthy information" which would lead a person of "reasonable caution" to conclude that an offense was being committed. *Brinegar v. United. States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949). *See also Dunaway v. New York*, 442 U.S. 200, 208 n.9, 99 S.Ct. 2248, 2254 n.9, 60 L.Ed.2d 824 (1979). Review of the relevant precedents demonstrates that this inquiry is not a simple matter. The Supreme Court and other federal tribunals have reached their decisions on a case-by-case basis. The facts of the particular situation must receive individual attention.

The Government does not argue that Kean, Fekete and Reed had probable cause to search the defendant's vehicle at the time they made the stop.[12] Rather the United States contends that when Pillo turned onto Route 115, the totality of the circumstances justified an "investigatory stop," *i. e.*, a procedure less intrusive than a search in which the agents could interview the suspect, examine traits of the Trans Am in plain view, and determine if adequate probable cause existed for a full-scale search. The Government then reasons that developments during the course of the investigatory stop provided an adequate basis for the investigators' subsequent action. Assessment of this proposition requires separate inquiries into the validity of the initial stop, the reasonableness of the search, and the seizure of the methamphetamine.

### A. Validity of the Stop and Search

The detention of Pillo's car at the side of the highway clearly had Fourth Amendment implications. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979). Three factors must be weighed in determining if the agents' conduct conformed to constitutional standards: "(i) the public interest served by the seizure, (ii) the nature and scope of the intrusion, and (iii) the objective facts upon which the law enforcement officer relied in light of his knowledge and expertise." *United States v. Mendenhall*, 446 U.S. 544, 561, 100 S.Ct. 1870, 1881, 64 L.Ed.2d 497 (1980) (Powell, J., concurring). After applying this rule on several occasions, the Supreme Court has established three axioms to guide trial courts in determining the

---

**10.** Indeed, the defendant essentially argues that probable cause *never* existed. As shall be explained, the United States maintains that probable cause developed after Kean and Fekete made several observations incidental to the investigatory stop.

**11.** The Government has not questioned the fact that Pillo had an expectation of privacy in the Trans Am and, therefore, had standing to assert the Fourth Amendment. *Rakas v. Illinois*, 439 U.S. 128, 140, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978).

**12.** Under cross-examination at the evidentiary hearing, Fekete stated that he thought he had probable cause to conduct a search as soon as Pillo's car was stopped. The agents, nevertheless, took a conservative course of action, and they completed the investigatory stop prior to the search. *See* Document 19 at 95–96. Furthermore, the Government's post-hearing brief did not contend that probable cause existed at the initial detention. Rather, the United States has consistently relied on the theory that probable cause arose during the course of the investigatory stop.

type of justification necessary to authorize a particular unconsented intrusion upon Fourth Amendment interests. First, the authorities have no right to stop or search a person when they have no reason to believe that the individual poses a physical threat, is involved in wrongdoing, or possesses evidence. *Ybarra v. Illinois*, 444 U.S. 85, 92–96, 100 S.Ct. 338, 342–45, 62 L.Ed.2d 238 (1979); *Delaware v. Prouse*, 440 U.S. at 663, 99 S.Ct. at 1401.[13] Second, the existence of full-blown probable cause authorizes a search, provided that the facts of the case are such that the warrant requirement is satisfied or excused. *Chambers v. Maroney*, 399 U.S. at 48–52, 90 S.Ct. at 1979–81. Finally, the Supreme Court has recognized an intermediate situation in which the law enforcement officer has an "articulable suspicion" that a search is appropriate. In such instances, the policeman or agent may briefly detain the suspect for questioning and, *if the confrontation gives rise to probable cause*, actually conduct a search. *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *United States v. Brignoni-Ponce*, 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975). During the course of such "investigatory stops," moreover, a law enforcement officer may make a limited search for weapons whenever such action appears necessary to protect his safety. *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968). For the Government to prevail in this case, the facts must demonstrate both an "articulable suspicion" at the time of the stop and a subsequent development of "probable cause."

Concededly, the Fourth Amendment embodies many flexible concepts. Terms such as "articulable suspicion" do not always lend themselves to ready definitions. A review of existing case law, nevertheless, establishes that the stop and search of Pillo's Trans Am fell within the bounds of police discretion already sanctioned by the judiciary. One major case is particularly instructive.

*Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) concerned a policeman patrolling a high-crime urban area who, during the early morning hours, received a tip that the defendant was carrying narcotics and had a gun secreted at his waist. The officer approached the car in which the suspect was seated alone and requested that the door be opened. The defendant, however, rolled down the window. At this point, the policeman reached into the automobile and withdrew a loaded pistol from the defendant's belt. The officer then arrested the suspect and searched the vehicle; he discovered other weapons and a "substantial" quantity of heroin. The Supreme Court upheld the policeman's actions.

In essence, the *Adams* majority held that the facts which confronted the patrolman permitted him to escalate gradually his intrusions upon the defendant's privacy until a full search was appropriate. The sequence began with the tip. By itself, the information did not constitute probable cause.[14] The tip, however, did permit the officer to make a "forcible stop" of the suspect. Justice Rehnquist, author of the *Adams* opinion, wrote that "[t]he Fourth Amendment does not require a policeman

**13.** There are certain exceptions to this principle which have no applicability to the instant situation. For example, routine questioning of drivers at permanently fixed checkpoints is *per se* consistent with the Fourth Amendment. Any subsequent search, however, must be based on consent or probable cause. *United States v. Martinez-Fuerte*, 428 U.S. 543, 567–68, 96 S.Ct. 3074, 3087, 49 L.Ed.2d 1116 (1976).

**14.** The Supreme Court has held that, standing alone, an informant's tip will constitute probable cause only if the two-pronged test of *Aguilar v. Texas*, 378 U.S. 108, 114, 84 S.Ct. 1509,

1514, 12 L.Ed.2d 723 (1964) is satisfied, *i. e.*, the underlying circumstances of the case must indicate that the informant is reliable and had access to the substance of the tip. *See also Spinelli v. United States*, 393 U.S. 410, 412–13, 89 S.Ct. 584, 586–87, 21 L.Ed.2d 637 (1969). In *Adams*, the policeman apparently knew from prior experience that the relator was reliable. 407 U.S. at 147, 92 S.Ct. at 1923. Yet there apparently was not enough information available to the policeman to conclude that the other prong of the *Aguilar* test was fulfilled. *Id.* at 147, 92 S.Ct. at 1923.

who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Id.* at 145, 92 S.Ct. at 1923. The second step occurred when the officer approached the defendant. The majority held that the totality of the circumstances justified the policeman to conclude that his safety was in danger.[15] Thus, the policeman was permitted to make a limited *Terry* search designed to uncover weapons. This conclusion justified removal of the pistol. Third, Justice Rehnquist reasoned that discovery of the revolver sufficiently corroborated the informant's story to authorize arrest of the suspect for unlawful possession of a weapon. *Id.* at 148–49, 92 S.Ct. at 1924. Finally, the search of the vehicle was upheld as incidental to the arrest. *Id.* at 149, 92 S.Ct. at 1924.[16]

█ The *Adams* rationale extends to the present litigation. Kean, Fekete, and Reed had the right to conduct an investigatory stop. Rodriguez's tips all indicated that Pillo carried a gun and was engaged in the drug trade as a distributor. The agents had dealt with the informant for a month during which time they investigated various portions of his story. Nothing contradicted Rodriguez. Indeed, many observations made throughout the surveillance coincided with the substance of the tip. Even more importantly, when Rodriguez came forward with his information, he admitted that he himself was involved in the methampheta-

mine venture. His story, therefore, amounted to a declaration against penal interest. In *Adams*, the Supreme Court held that the circumstances of the situation determine the degree of reliance that may be placed on a particular tip. 407 U.S. at 147, 92 S.Ct. at 1923. The dependability of a story is increased when the informant has exposed himself to criminal liability in contacting the authorities. *United States v. Harris*, 403 U.S. at 583–85, 91 S.Ct. at 2081–82 (plurality opinion); *United States v. Davis*, 617 F.2d 677, 693 (D.C.Cir.1979). In short, all the facts known to the agents on the evening of January 14, 1981 justified an inference that Pillo was transporting methamphetamine that had just been produced in the resort. The court concludes that the circumstances justified the investigators to suspect that the defendant was violating the law. Consequently, the agents had the right to stop the Trans Am. *United States v. Cortez*, 101 S.Ct. at 694–95.

█ Probable cause, moreover, developed when Kean, Fekete, and Reed approached the car. Their order that Pillo leave the vehicle was reasonable. *See Pennsylvania v. Mimms*, 434 U.S. 106, 108–11, 98 S.Ct. 330, 332–33, 54 L.Ed.2d 331 (1977). Two grounds existed for taking custody of the gun. Initially, the weapon was in plain view between the seat and console and, thus, could be seized. *Colorado v. Bannister*, 449 U.S. 1, 2–4, 101 S.Ct. 42, 43–44, 66 L.Ed.2d 142 (1980).[17] Second,

15. The circumstances included: the tip, the time of day, the nature of the neighborhood, and the fact that the suspect lowered the window when he was asked to open the door. 407 U.S. at 147–48, 92 S.Ct. at 1923–24. In effect, these developments gave rise to an "articulable suspicion." *See United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981).

16. For other cases validating searches which begin as investigatory stops, *see United States v. Matthews*, 615 F.2d 1279, 1283–84 (10th Cir. 1980); *United States v. Jimenez*, 602 F.2d 139, 140–42 (7th Cir. 1979). *See also United States v. Cortez*, 101 S.Ct. at 692–97, where the Supreme Court first held that the facts justified the initial stop and then validated the subsequent search on the basis of consent.

17. *See also United States v. Bryant*, 580 F.2d 812, 813 (5th Cir. 1978). There, federal agents received an anonymous tip that a particular van would be carrying an illegal sawed off shotgun. Acting on this information, an investigator approached a parked, unoccupied vehicle which matched the caller's description. The agent peered into the van's left front window and saw the handle of a gun lodged between the two seats. The investigator surmised that the handle was too big to belong to a pistol; hence, he seized the weapon, which turned out to be a modified shotgun. The defendant was arrested for violation of the firearms laws. The Court of Appeals for the Fifth Circuit upheld the taking of the weapon on the ground that the tip, when corroborated by the agent's observations, constituted probable cause to search. *Id.*

Rodriguez's assertion that Pillo was armed justified the agents in carrying out a *Terry* search for safety purposes. The scope of this probe could include any place within the reach of the driver. Accordingly, the investigators could have searched the console even if the pistol had not been exposed. *United States v. Rainone*, 586 F.2d 1132, 1135–36 (7th Cir. 1978).[18]

Finally, Fekete's decision to search the trunk comported with the Fourth Amendment. The discovery of the pistol exactly where Rodriguez predicted it would be lent additional credibility to the informant's assertions. *Adams v. Williams*, 407 U.S. at 148–49, 92 S.Ct. at 1924. Furthermore, the odor of methylamine was another powerful indicia of the illicit drug trade. *Johnson v. United States*, 333 U.S. 10, 13, 68 S.Ct. 367, 368, 92 L.Ed. 436 (1948). Judged as a whole, the observations and findings available to the agents at the time of the investigatory stop justified the overall search. *Chambers v. Maroney*, 399 U.S. at 50–52, 90 S.Ct. at 1980–81; *United States v. Moschetta*, 646 F.2d 955, 957–62 (5th Cir. 1981) (trunk search).

## III. SEIZURE OF THE NARCOTICS

Pillo's final argument concerns the opening of the plastic boxes containing the methamphetamine. Essentially, he contends that the probing of these packages involved an entirely new search for Fourth Amendment purposes and, thus, gave rise to a separate requirement for probable cause and a warrant. The record conclusively demonstrates that the agents did not obtain a warrant before they opened the boxes. Also, apparently nothing would have prevented them from assuming custody of the parcels and then seeking out a magistrate to gain permission for examination of the interiors. Therefore, the evidence must be suppressed if the viewing of the contents did in fact amount to a new search. Assessment of this argument demands an understanding of two important Supreme Court precedents.

In *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), the defendants attempted to transport marijuana in a large footlocker which two of their number carried as they traveled the Amtrak system. Railroad officials became alarmed by both the size of the locker and the fact that it leaked talcum powder, a substance commonly used to conceal the smell of narcotics. The federal authorities were informed and agents were present when the suspects exited the train in Boston. A specially trained dog indicated that the footlocker contained a controlled substance. The investigators arrested the defendants just as they placed the luggage into the trunk of a waiting automobile. The locker was opened at the stationhouse, and the agents discovered marijuana. The lower judiciary suppressed the evidence and the Supreme Court affirmed. *Chadwick* began with the observation that the Fourth Amendment extends to movable luggage. *Id.* at 6–11, 97 S.Ct. at 2480–83. The majority then explained that an individual's justifiable expectation of privacy in such items is greater than that in an automobile. Thus, a probe of the footlocker required probable cause and a new satisfaction of the Warrant Clause. The agents had never obtained a warrant to open the luggage, and no exigency excused their obligation to do so, since the locker could have been impounded temporarily. On this basis, the search was invalid. *Id.* at 11, 97 S.Ct. at 2483. Finally, the Court ruled that the investigators' conduct could not be sanctioned as a search incidental to arrest. *Id.* at 11–16, 97 S.Ct. at 2483–86.

The *Chadwick* rationale received a significant amplification in *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979). In the latter case, several municipal policemen received a tip from a normally reliable informant that the defendant would soon arrive at the city airport with a

---

**18.** The *Rainone* panel held that a *Terry* search of an automobile may extend to all areas accessible to a person seated in the car even if the driver had been ordered out of the vehicle. The Seventh Circuit felt that the option must exist to protect the investigator after the suspect had returned to the automobile. 586 F.2d at 1134.

green suitcase containing marijuana. At the designated time and place, the officers observed the suspect and a companion appear, place a piece of green luggage in the trunk of a taxicab, and drive off. The police followed. After several blocks, the officers stopped the cab, opened the green suitcase, and seized the marijuana. The defendant was found guilty of violating the state narcotics laws. An Arkansas appellate tribunal reversed the conviction. Before the United States Supreme Court, the prosecution maintained that the normal warrant requirement was inapplicable, because the suitcase had been taken from a moving car which would have sped away if the police had sought out a magistrate. The majority disagreed. Speaking for the Court, Justice Powell reaffirmed the basic holding of *Chadwick*, i. e., a luggage probe is itself a search. He went on to explain that the exigencies arising from mobility disappeared once the officers seized the suitcase. At that point, the warrant requirement attached. Consequently, the lack of a warrant invalidated the search. *Arkansas v. Sanders*, 442 U.S. at 761–66, 99 S.Ct. at 2591–94. Justice Powell's opinion, however, also contained the following significant passage in footnote 13:

> Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some containers (for example, a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance. Similarly, in some cases the contents of a package will be open to "plain view," thereby obviating the need for a warrant. There will be difficulties in determining which parcels taken from an automobile require a warrant for their search and which do not. Our decision in this case means only that a warrant generally is required before personal luggage can be searched and that the extent to which the Fourth Amendment applies to containers and other parcels depends not at all upon whether they are seized from an automobile.

*Id.* at 764–65 & n.13, 99 S.Ct. at 2593–94 & n.13 (citation and footnote omitted).

Cases following *Sanders* have attempted to provide a principled basis for distinguishing those containers which "deserve the full protection of the Fourth Amendment" from those which do not. The Court of Appeals for the Second Circuit, for example, has developed a fairly complex test in which the decision depends on the existence of "some objective external evidence of an expectation of privacy." *United States v. Mannino*, 635 F.2d 110, 114 (2d Cir. 1980). In applying this rationale, the reviewing court must pay close attention to the extent that "the owner may have signaled an expectation of privacy by taking special precautions to secure and secrete the contents of a container." *Id.* On the basis of this test, the Second Circuit has held that the Fourth Amendment applies to taped cartons, but not to partially opened plastic bags. *Compare United States v. Dien*, 615 F.2d 10, 11 (2d Cir. 1980) *with United States v. Mannino*, 635 F.2d at 114–15.

The Court of Appeals for the District of Columbia Circuit, conversely, has rejected any test keying on the "objective" nature of the container. *United States v. Ross*, 655 F.2d 1159 (D.C.Cir. 1981) (*en banc*) concerned the right of the police to search a paper bag found in the trunk of a car. Many previous decisions from other jurisdictions had held that such parcels normally do not give rise to an "expectation of privacy" because of their outward appearance. *See, e. g., United States v. Brown*, 635 F.2d 1207, 1211 (6th Cir. 1980); *United States v. Honigman*, 633 F.2d 1336, 1337–38 (9th Cir. 1980); *United States v. Mackey*, 626 F.2d 684, 686–88 (9th Cir. 1980); *United States v. Jimenez*, 626 F.2d 39, 40–41 (7th Cir. 1980).[19] The *Ross* court refused to define a

---

19. Read together, these decisions appear to hold that a paper bag is so fragile that a person storing items therein cannot expect maintenance of privacy. Accordingly, the "objective" nature of the container is said to fail the test

"worthy container" for constitutional purposes. The majority reasoned that such a rule would prove unmanageable.[20] On that basis, *Ross* limited the exceptions to the warrant requirement to those expressly recognized in *Arkansas v. Sanders, viz.,* where the criminal nature of the package is immediately apparent or the contents are in plain view. *United States v. Ross,* 655 F.2d at 1170.

The Supreme Court granted certiorari in *Robbins v. California,* —— U.S. ——, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981), apparently in an attempt to alleviate some of the confusion which had arisen among the circuits in the wake of *Sanders* and *Chadwick.* Unfortunately, the ruling that resulted was somewhat inconclusive, because there was no majority position. A close analysis of the various opinions, however, indicates that at least five members of the Court would have voted to suppress the evidence seized in Pillo's trunk.

*Robbins* concerned the driver of a station wagon who was stopped by the California state police for driving erratically. A number of factors, particularly the odor of marijuana smoke, prompted the officers to search the vehicle. They discovered two packages wrapped in opaque green plastic and hidden in a recessed luggage compartment. Upon opening these containers, they found thirty pounds of marijuana. The state judiciary upheld the search of the parcels on the ground that their contents could be inferred from their outward appearance. The Supreme Court reversed. *Id.* at ——, 101 S.Ct. at 2841.

Writing for a plurality of four, Justice Stewart adopted the *Ross* holding that the Fourth Amendment protection appropriate to a particular container does not hinge on physical criteria, such as sturdiness or security precautions. He explained that the "objective" theory espoused by *Mannino* and other precedents has no support in constitutional jurisprudence and threatened to cause confusion, since there were no reliable standards for applying the test. *Id.* at ——, 101 S.Ct. at 2844. Even more importantly, Justice Stewart explained that the situations in which containers seized from automobile trunks could be searched without a warrant or exigency were limited. One such exception, "plain view," only exists when "the contents of the package" are "open" to examination from the outside. *Id.* The second, which concerns packages that "by their very nature cannot support any reasonable expectation of privacy," is:

likewise little more than another variation of the 'plain view' exception, since, if the distinctive configuration of a container proclaims its contents, the contents cannot fairly be said to have been removed from a searching officer's view. The same would be true, of course, if the container were transparent, or otherwise clearly revealed its contents. *In short, the negative implication of footnote 13 of the Sanders opinion is that unless the container is such that its contents may be said to be in plain view, those contents are fully protected by the Fourth Amendment.*

*Id.* (emphasis added). The plurality concluded that *Robbins* did not fall within any of the exemptions recognized by *Sanders.*

---

for Fourth Amendment protection established by *Arkansas v. Sanders.*

**20.** According to the *Ross* opinion:

The fine distinctions into which the police and the courts would be drawn were we to adopt an 'unworthy container' rule are apparent. Size could not be the dividing line, nor does the Government contend otherwise given its concession that the leather pouch is encompassed by *Sanders.* A priceless bequest, great grandmother's diary, for example, could be carried in a sack far smaller than one accommodating jogging suit and

sneakers. And if quality of material is what counts, on what side of the line would one place the variety of parcels people carry? Are police to distinguish cotton purse from silk; felt, vinyl, canvas, tinfoil, cardboard, or paper containers from leather; sacks closed by folding a flap from those closed with zippers, drawstrings, buttons, snaps, velcro fastenings, or strips of adhesive tape? Would a Tiffany shopping bag rank with one from the local supermarket?

*United States v. Ross,* 655 F.2d 1159 at 1170 (footnotes omitted).

Consequently, the marijuana found in the packages was suppressed for failure to satisfy the warrant requirement. *Id.* at 2844–46.[21]

Justice Powell concurred in the judgment. He rejected the *Ross* rationale, which in his view extended the safeguards of the Fourth Amendment to a variety of items in which there was no justifiable expectation of privacy, e. g., "a cigar box or a Dixie cup." *Id.* at ——, 101 S.Ct. at 2849. To counter this position, Justice Powell endorsed the case-by-case "objective" analysis of *Mannino* and its related holdings. *Id.* He explained his overall conclusion thusly:

> I nevertheless concur in the judgment because the manner in which the package at issue was carefully wrapped and sealed evidenced petitioner's expectation of privacy in its contents. As we have stressed in prior decisions, a central purpose of the Fourth Amendment is to safeguard reasonable expectations of privacy.

*Id.* at ——, 101 S.Ct. at 2847.[22]

There were three dissents, all of which sprang from different reasoning. Justice Blackmun registered his continuing disagreement with *Sanders* and *Chadwick*. *Id.* at ——, 101 S.Ct. at 2850. Justice Rehnquist called for abrogation of the exclusionary rule as it applied to the states. *Id.* at ——————, 101 S.Ct. at 2850–54. Finally, Justice Stevens maintained that the search should have been upheld as part of the "automobile exception" to the Warrant Clause. He argued that since the exigencies of the situation permitted a warrantless search of the station wagon, the state police were justified in opening all the packages contained therein. *Id.* at ——— – ———, 101 S.Ct. at 2854–58.

These varying opinions must now be placed in proper perspective. This court does not doubt that the three dissenters in *Robbins* would all vote against suppression of the methamphetamine.[23] The four Justices in the plurality, however, would side with the opposite conclusion. As previously explained, Agent Fekete had no warrant to search Pillo's "Tupperware type" boxes, and no exigency prevented him from obtaining one after a temporary impoundment. Accordingly, the evidence may only be admitted · if the situation fits one of the two recognized exceptions to *Sanders*. The "plain view" doctrine is inapplicable, because the containers were not opened. *Robbins v. California,* —— U.S. at ——, 101 S.Ct. at 2844. Also, this was not a situation in which the configuration, transparency, or any other feature of the packages made it "obvious" that they "could only contain" methamphetamine. *Id.* at ——, 101 S.Ct. at 2846. Concededly, there were many indicia of probable cause. As in *Robbins*, the smell of the illicit substance pervaded the suspect's vehicle. Additional factors included: (1) Rodriguez's tips, (2) data from the ski lodge surveillance, (3) visibility of the crystalline tablets, and (4) the agents' previous experience which indicated that the packages were very similar to those normally used in the drug trade. All of these items, nevertheless, go to satisfy the necessity for probable cause; they did not render the contents of the containers visible to the agents. *See United States v. Ross,* 655 F.2d 1159 at 1161–1162, 1170–1171. The fact remains that Fekete could not accurately determine that the boxes concealed methamphetamine until he opened them. For this reason, the "contents may [not] be said to be in plain view" under either of the *Sanders-Robbins* exemptions. *Id.* at ——, 101 S.Ct. at 2846.[24]

**21.** Justices Brennan, White, and Marshall joined in the plurality opinion.

**22.** Chief Justice Burger concurred in the judgment without opinion. For this reason, it is not possible to determine how he would have analyzed the present case.

**23.** Technically, much of Justice Rehnquist's dissent does not apply to the instant litigation, in that he called for freeing states from adherence to the exclusionary rule and the present situation concerns a search by the federal authorities. Yet a reading of his general discussion, especially his references to *Sanders* and *Chadwick*, leaves no doubt with regard to his general position. *Id.* at ——, 101 S.Ct. at 2854.

**24.** *Compare United States v. Portillo,* 633 F.2d 1313, 1315–20 (9th Cir. 1980), in which a deputy sheriff discovered two bags during a valid trunk search. He opened the parcels and dis-

Finally, attention must turn to the concurring opinion of Justice Powell. The court has already explained the crux of this position, *viz.*, emphasis on the "objective" appearance of the containers in question. Judged from this viewpoint, the instant case is virtually controlled by *Robbins.* As in the latter situation, the relevant packages were carefully taped, sealed, and locked in a covert portion of the vehicle. Although the "Tupperware type" boxes were "translucent" rather than "opaque," their contents could only be determined by opening them. In short, according to the "objective" theory, the defendant took adequate steps to assert his expectation of privacy in the packages. Consequently, it is concluded that five members of the present Supreme Court would vote to suppress the methamphetamine seized in Pillo's Trans Am.[25]

In suppressing the methamphetamine, the court acts with considerable reluctance. Pillo was engaged in serious criminal activity. The DEA agents, moreover, acted in good faith and with abundant probable cause.[26] Yet a fair reading of the relevant case law indicates that the defendant's motion to suppress must be granted in this regard.

## IV. CONCLUSION

To summarize this Memorandum and Order, there are two basic holdings. First, seizure of the unregistered pistol was fully constitutional.[27] The methamphetamine

taken from the containers in the trunk, however, shall be suppressed pursuant to the defendant's motion.

---

covered that each contained a loaded revolver. The Court of Appeals for the Ninth Circuit upheld seizure of the weapons on the ground that when the deputy lifted the bags he could feel the pistols.

25. The court is aware of the ruling in *United States v. Sanders*, 631 F.2d 1309 (8th Cir. 1980), *cert. denied*, 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981) which sanctioned the seizure of heroin contained in an opaque envelope found on the floorboard of the defendant's car. To a large extent, the panel relied on the fact that the investigators knew through experience that such envelopes were commonly used by purveyors of heroin. *Id.* at 1314–15 & n.7. This reasoning has some appeal. In light of *Robbins*, however, the court concludes that this type of argument cannot be used to evade

the warrant requirement with regard to containers found in the trunks of vehicles.

26. The Court of Appeals for the Fifth Circuit has held that the exclusionary rule should not be applied when the offending law enforcement officer acted in good faith. *United States v. Williams*, 622 F.2d 830, 840 (5th Cir. 1980), *cert. denied*, 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981). Our circuit, nonetheless, has adopted no such rule. *Compare, United States v. Shaefer, Michael & Clairton Slag, Inc.*, 637 F.2d at 203.

27. Impoundment of the sweater, of course, was valid since the garment was in "plain view" due to its position in the open carry-all.