**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

LIONEL MENDEZ,
            *Defendant-Appellant.*

No. 05-10205

D.C. No.
CR-04-00241-JAT

OPINION

Appeal from the United States District Court
for the District of Arizona
James A. Teilborg, District Judge, Presiding

Argued and Submitted
February 16, 2006—San Francisco, California

Filed October 30, 2006

Before: Stephen Reinhardt, Richard A. Paez, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Reinhardt;
Dissent by Judge Tallman

18019

**COUNSEL**

Jon M. Sands & Michael D. Gordon, Federal Public Defender, Phoenix, Arizona, for the defendant-appellant.

Paul K. Charlton, John Joseph Tuchi & Bill C. Solomon, United States Attorney, Phoenix, Arizona, for the plaintiff-appellee.

**OPINION**

REINHARDT, Circuit Judge:

On a December evening in 2003, appellant Lionel Mendez was pulled over by two police officers for failure to display a visible license plate or registration tag. He was asked to exit the vehicle, patted down for weapons and, although there were three small children in the car, told to sit on the curb behind the vehicle while a records check was conducted. In response to questioning about matters unrelated to the purpose of the traffic stop, Mendez ultimately told the officers that there was a gun in the car, at which point they arrested him, searched the car and found the gun. After the district court denied his motion to suppress the evidence, Mendez entered a conditional plea of guilty to being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The only issue on appeal is whether the district court erred when it denied his motion to suppress. We conclude that it did, vacate Mendez's conviction and remand.

## I.  FACTUAL AND PROCEDURAL HISTORY[1]

At approximately 9:18 p.m. on December 21, 2003, two Phoenix gang enforcement officers pulled over a car driven by Mendez because they mistakenly thought that it did not have a license plate or temporary registration tag.[2] Both officers testified that the sole purpose of the stop was "no registration." The officers, Detectives Jaensson and Bracke, approached the car and saw that there were three small children inside. Det. Jaensson told Mendez why they had stopped him and asked for "his identification or license." Mendez presented a California identification card. Det. Jaensson then instructed him to get out of the vehicle and interlock his hands behind his head. He proceeded to pat him down for weapons, during which time he noticed a tattoo on his left hand. Mendez complied without incident. The pat-down produced

---

[1]Our recitation of the facts is based primarily on the testimony adduced at the suppression hearing. Detectives Jaensson and Bracke testified; Mendez did not.

[2]The dissent describes the area in which Mendez was stopped as a "gang area." However, any such determination "requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity." *United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) (en banc) (discussing the labeling of an area as "high-crime," but equally applicable to the "gang area" label). Thus, we have determined that "[d]istrict courts must carefully examine the testimony of police officers in cases such as this," and have emphasized the importance of being "particularly careful" to ensure that such a characterization "is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but is limited to specific, circumscribed locations." *Id.* The district court made no such determination before characterizing the area as a gang area. Nor were there grounds to do so. The officers did not describe the neighborhood as such during the suppression hearing or offer any facts to support such a conclusion. That defense counsel accepted the district court's characterization in order to refute the court's suggestion does not eliminate the necessity of ensuring that such a characterization is properly made. Equally important, the district court did not rely on the characterization to support its finding of reasonable suspicion.

no weapons. Det. Jaensson then instructed Mendez to sit on the curb behind his car. The three small children remained in the vehicle unattended.

Det. Jaensson stayed with Mendez at the curb while Det. Bracke took his identification card to the patrol car to conduct a records check. Det. Jaensson again noticed the tattoo on Mendez's left hand, recognizing it as a gang-affiliated insignia.[3] Prompted by the gang tattoo, he questioned Mendez, asking, "Where are you from?" According to Det. Jaensson, Mendez responded that he was "from the Latin Kings," a gang located in Chicago. Det. Jaensson testified that he then continued the questioning, next asking Mendez about his other tattoos. In response to Det. Jaensson's interrogation, Mendez said at some point that he had left the Latin Kings "in good standing," and had moved to Arizona "to get away from all that, to turn his life around."[4]

While a portion, at least, of Det. Jaensson's interrogation of Mendez was taking place, Det. Bracke was at the patrol car conducting a records check, using the car's Mobile Data Terminal ("MDT").[5] At this time, he noticed in the rear window

---

[3]The tattoo, which displayed a lion wearing a five-point crown and the letters "LK," aroused Det. Jaensson's suspicion that Mendez was affiliated with a Chicago-based street gang known as the "Latin Kings."

[4]The record does not reveal at what point during the questioning Mendez disclosed this information, or the substance of the precise questions asked by Det. Jaensson. Although the district court made no findings on this point, it is evident from the record that Mendez did not disclose the information regarding the reason for his move to Arizona in response to Det. Jaensson's first question. Det. Bracke heard this response after he completed a records check, almost eight minutes after the initial stop. Regardless of how this information came out in the course of Det. Jaensson's interrogation, there is no relevant factual dispute about what happened with respect to Det. Bracke's later questions and Mendez's answers to them.

[5]The MDT is the computer in the patrol car that the officers use to conduct records checks.

of Mendez's vehicle a temporary registration plate that had expired eight days earlier on December 13, 2003.

After completing the records check, which revealed that Mendez had a valid driver's license and no outstanding warrants, Det. Bracke returned to the curb with the intention of informing him that the temporary registration plate in his rear window had expired. At that time, he overheard Mendez telling Det. Jaensson, in response to the detective's questioning, that he had come to Arizona "trying to get away from the gang life."[6] Det. Bracke also overhead him answer that he had spent time in prison in Illinois. Det. Bracke then questioned Mendez as to why he had been imprisoned.[7] Mendez replied that he had been convicted of a weapons violation. Det. Bracke then asked him if he had any weapons in the car. According to Det. Jaensson and Det. Bracke's testimony, Mendez became agitated, told them that he was a good father and was trying to make a good life for himself in Arizona, and then said that there was a firearm in the driver's door handle. At this point, the officers arrested him. Det. Bracke then

---

[6]Det. Bracke also testified that he heard Mendez state that he had been, or was, a member of the Latin Kings. Whether the detectives believed that Mendez was a former or current gang member — and there is no testimony on this point — is irrelevant to our disposition of this case: our analysis is the same on either set of facts.

[7]Det. Bracke initially testified that Mendez had "volunteered" that his prison term was for a weapons violation, but shortly thereafter he corrected himself, stating, "I believe I may have, in fact, asked him" why he had spent time in prison. Moments earlier in his testimony, Det. Bracke testified, "I did, in fact, ask [Mendez] something after he informed us that he had spent time in prison in Illinois." Det. Jaensson similarly testified that "Det. Bracke may have specifically asked a question" regarding Mendez's prison term. By contrast, the written police report, which was filed seven months earlier on January 2, 2004, makes no mention of the fact that Det. Bracke questioned Mendez about his prison term; instead, it merely states that Mendez "told detectives that he had just spent eight years in the Illinois State Department of Corrections for a weapons violation." At oral argument before this court, the government conceded that Det. Bracke had in fact asked Mendez why he had been imprisoned.

searched the vehicle and found a loaded, small caliber, semi-automatic pistol in the driver's side armrest.

Mendez was indicted on charges of violating 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (felon in possession of a firearm).[8] He moved to suppress the handgun, arguing that the officers improperly interrogated him about matters unrelated to the traffic stop and failed to diligently investigate the purpose of the stop. The district court denied the motion, finding that the detectives "identified specific, objective factors sufficient to permit them to expand the scope of questioning" and did not unreasonably prolong the stop. Mendez subsequently entered a conditional guilty plea, preserving his right to appeal the court's ruling on the suppression motion. The district court sentenced him to fifty-seven months in prison. He appeals.

## II.  DISCUSSION

Mendez does not contest the legality of the initial traffic stop. Instead, he argues that the officers' unrelated questioning and extended detention violated his Fourth Amendment rights because (1) the officers did not observe additional particularized, objective factors sufficient to create reasonable suspicion to justify interrogating him about matters beyond the purpose of the stop, and (2) the officers unreasonably prolonged the stop.[9] The government responds that there were

---

[8]Section 922(g)(1) prohibits any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . [from] possess[ing] . . . any firearm or ammunition." 18 U.S.C. § 922(g)(1). Section 924(a)(2) provides, in relevant part, that anyone who knowingly violates section 922(g) "shall be fined as provided in this title, imprisoned not more than 10 years, or both." *Id.* § 924(a)(2).

[9]Because, as we explain below, we conclude that the interrogation of Mendez was not justified by sufficient "particularized, objective factors," we do not address his argument that the officers unlawfully prolonged the stop under *United States v. Sharpe*, 470 U.S. 675, 686 (1985). We also need not consider Mendez's claim that the officers' questioning violated Arizona law. We do note, however, that Mendez forfeited his state law claim by failing to raise it before the district court in his motion to suppress.

specific, objective factors that justified suspicion of criminal activity and the expansion of the scope of the questioning. It does not argue, however, that the questioning was justified by concerns for officer safety.

A.   *Propriety of the Investigatory Questioning*

[1] The limits of the Fourth Amendment "apply to investigative stops of vehicles such as occurred here." *United States v. Sharpe*, 470 U.S. 675, 682 (1985). The scope of an investigative detention "must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983). During a traffic stop, a police officer may only "ask questions that are reasonably related in scope to the justification for his initiation of contact." *United States v. Murillo*, 255 F.3d 1169, 1174 (9th Cir. 2001); *see also United States v. Chavez-Valenzuela*, 268 F.3d 719, 724 (9th Cir. 2001) ("An officer must initially restrict the questions he asks during a stop to those that are reasonably related to the justification for the stop."). An officer may expand the scope of questioning beyond the initial purpose of the stop only if he "articulate[s] suspicious factors that are particularized and objective." *Murillo*, 255 F.3d at 1174; *see also Chavez-Valenzuela*, 268 F.3d at 724 (stating that an officer may expand scope of questioning "*only if* he notices particularized, objective factors arousing his suspicion" (emphasis added)); *United States v. Perez*, 37 F.3d 510, 513 (9th Cir. 1994) (same).

As the Eleventh Circuit held in another traffic stop case, *United States v. Pruitt*, 174 F.3d 1215 (11th Cir. 1999), it is not necessary that questions be designed to pursue a specific investigatory objective in order for them to violate the Fourth Amendment. There, the court concluded that "additional 'fishing expedition' questions such as 'What do you do for a living?' and 'How much money did your van cost?' are simply irrelevant, and constitute a violation of *Terry*." *Id*. at 1221. We cited *Pruitt* with approval in *Chavez-Valenzuela*. *See Chavez-Valenzuela*, 268 F.3d at 724 n.4.

**[2]** In the case before us, the record demonstrates that the officers asked Mendez a number of questions that were unrelated to the purpose of the stop, including questions involving his gang affiliation and the reason for an out-of-state prison sentence a number of years earlier. Det. Jaensson began his questioning by asking Mendez where he was from. Although we doubt that this question was related to the purpose of the stop, we will assume its propriety for purposes of this appeal. Taken literally, the question would probably be permissible, as it would appear to relate to the locality at which the driver's license or the vehicle registration would have been issued. To that extent, it would be related to the traffic stop.[10] We assume the lawfulness of the question although in context it is best understood as an inquiry in colloquial terms about Mendez's gang membership — the information it actually elicited — rather than, as might otherwise be thought, a question about the location of his domicile. Indeed, during the suppression hearing, defense counsel asked Det. Jaensson whether "the questions about where he was from ha[d] anything to do with the traffic stop," to which Det. Jaensson responded, "No."

Subsequently, in response to Det. Jaensson's continuing interrogation, Mendez told the officers that he had been in prison. Det. Bracke then questioned him about the reason for his prior incarceration. When Mendez answered that he had been convicted of a weapons offense, more than eight years earlier, Det. Bracke asked him whether there were any weapons in the car. It is the eliciting of this information that led Det. Bracke to ask that final question that is at the center of this appeal.

---

[10]*Cf. Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (stating that an "officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions"); *Chavez-Valenzuela*, 268 F.3d at 724 n.4 (observing that officer's "inquiries about Chavez-Valenzuela's starting point, destination and general travel plans were probably justifiable").

**[3]** The government concedes that, in order to question Mendez about matters unrelated to the initial purpose of the stop, the detectives' questioning had to be justified by additional particularized and objective factors arousing their suspicion. *See, e.g., Perez*, 37 F.3d at 513. Therefore, Det. Jaensson's further questioning of Mendez about matters related to his gang affiliation or criminal history would constitute a Fourth Amendment violation unless the officer had lawfully "notice[d] particularized, objective factors arousing his suspicion." *Chavez-Venezuela*, 268 F.3d at 724. Likewise, Det. Bracke's question about the reason for Mendez's prior conviction would have to have been based on "particularized, objective factors" not themselves discovered through illegal questioning — factors that are sufficient in themselves to generate reasonable suspicion of criminal activity. *Id.* at 726.

### 1. Det. Jaensson's interrogation regarding Mendez's gang activities

**[4]** We begin our analysis of Det. Jaensson's questioning, then, by determining what information he could properly consider in forming a reasonable suspicion. We assume, as explained earlier, that the officers were made aware lawfully of Mendez's past or present gang membership. Thus, in order to assess the constitutionality of Det. Jaensson's continuing interrogation, we first consider whether gang membership, standing alone, justifies a reasonable suspicion of criminal activity.[11] We conclude that it does not, for two reasons.

---

[11]We note that, in addition to Mendez's gang membership, the officers were aware of two other facts: (1) when asked for "his identification or license," Mendez presented a California identification card and not a driver's license, and (2) the car he was driving had an expired temporary registration tag. Neither of those facts is, however, relevant to our totality of the circumstances analysis with respect to the additional questioning. The production of the identification card constituted an appropriate response to the officers' specific request. Although the fact that the registration had expired may be pertinent to a registration offense, a recently expired registration does not give rise to reasonable suspicion of involvement in crimi-

**[5]** First, the Supreme Court has made it clear that reasonable suspicion must be based upon "a particularized and objective basis for suspecting *the particular person* stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981) (emphasis added); *see also United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc) (stating that "[t]he requirement of *particularized* suspicion encompasses . . . suspicion that *the particular person being stopped* has committed or is about to commit a crime"); *United States v. Rodriguez-Sanchez*, 23 F.3d 1488, 1492 (9th Cir. 1994) ("Reasonable suspicion requires that the specific facts and inferences create suspicion that *the particular person detained* is engaged in criminal activity." (emphasis added) (internal quotation marks omitted)), *overruled in part on other grounds by Montero-Camargo*, 208 F.3d at 1134 n.22. Reasonable suspicion may not be "based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." *Id.* at 1492; *see also United States v. Rodriguez*, 976 F.2d 592, 596 (9th Cir. 1992) (holding that factors relied upon by border patrol agents to justify vehicle stop "describe too many individuals to create a reasonable suspicion that *this particular defendant* was engaged in criminal activity" (emphasis added)).

**[6]** Mendez's former or present gang affiliation may arouse in the mind of the average layperson, as well as of the trained police officer, a generalized or unspecific suspicion that he is

nal activity, whether considered alone or in combination with gang affiliation. The only Ninth Circuit case the dissent relies on to the contrary involves a boat, not a car, where the driver was unable to name the owner of the boat and had no registration at all. *United States v. Thompson*, 282 F.3d 673, 678 (9th Cir. 2002). Nor does *United States v. Fernandez*, 18 F.3d 874 (10th Cir. 1994), hold that an expired registration creates reasonable suspicion of criminal activity. That case points to the fact that the driver had proof of a valid registration to support its conclusion that no reasonable suspicion existed.

associated with criminal types and perhaps has engaged in criminal activity himself. But the fact that an individual is or was a gang member does not by itself generate the sort of particularized and legally relevant suspicion that the Fourth Amendment requires. As one district court has observed, "One's status as a gang member, . . . even a gang member with a known arrest or conviction record, does not, without more, create the reasonable and articulable suspicion necessary to justify an investigative detention. . . . *Terry* and its progeny require *some* degree of particularized suspicion beyond gang membership alone." *United States v. Daniel*, 804 F. Supp. 1330, 1335 n.10 (D. Nev. 1992).

Of course, Detectives Jaensson and Bracke were part of the gang enforcement unit,[12] and officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). However, "[p]ermissible deductions or rational inferences must be grounded in objective facts and be capable of rational explanation." *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996). No matter how much "experience and specialized training" the detectives had in gang-related matters, the mere fact of Mendez's admission regarding gang affiliation does not permit "a rational inference" that he was involved in criminal activity at or about the time of the stop.

[7] Second, an officer's questioning "must be justified by some objective manifestation that the person stopped *is, or is about to be*, engaged in criminal activity." *Cortez*, 449 U.S.

---

[12]Det. Jaensson testified at the suppression hearing that during his eight years working for the Phoenix Police Department's gang enforcement unit, he had "run across numerous individuals from various gangs and several of them from the Latin Kings," and also "had training in identifying gang tattoos and gang members."

at 417 (emphasis added); *see also Brown v. Texas*, 443 U.S. 47, 51 (1979) (officers must have "reasonable suspicion, based on objective facts, that the individual *is involved* in criminal activity") (emphasis added). Although Mendez's gang affiliation might arouse suspicion that he was involved in criminal activity at some point in the past and might lead a reasonable officer to suspect that he may become involved in such activity at some point in the future, it does not support a reasonable inference "that criminal activity may *be afoot*" at the time of the stop or that Mendez might commit any *particular offense* now or in the future. *Terry v. Ohio*, 392 U.S. 1, 30 (1968) (emphasis added). As we have observed in another context,

> Membership in an organization does not reasonably lead to any inference as to *the conduct of a member on a given occasion*. In other words, the tendency of members of a gang to carry weapons does not lead reasonably to any inference as to whether a gang member was armed *on a given occasion*.

*Spivey v. Rocha*, 194 F.3d 971, 978 (9th Cir. 1999) (internal quotation marks and citation omitted) (emphasis added).[13] Likewise, Mendez's affiliation with the Latin Kings does not by itself "reasonably lead to any inference as to [his] conduct"

---

[13]*Spivey* did not involve a Fourth Amendment claim; rather, it concerned whether the trial court properly excluded evidence that two prosecution witnesses were gang members. *Id.* at 977-78. We held that the exclusion was not error because the fact of gang membership "was not probative to the question of whether [the witnesses] were armed." *Id.* at 978.

The dissent, in criticizing our reliance on *Spivey*, appears to argue that the requirement that there be *reasonable* inferences to support a deprivation of liberty applies only at trial and has no place in the Terry stop analysis. *Terry* itself, however, explains that reasonableness is the "central inquiry" under the Fourth Amendment and requires that an officer act only on the basis of "specific reasonable inferences which he is entitled to draw." *Terry*, 392 U.S. at 19, 27.

on the night of the stop. *Id*. As the district court in *Daniel* observed,

> An individual's membership in a gang may cause a police officer to have an "inchoate and unparticularized suspicion" that the individual's every waking moment is given to criminal behavior. *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883. However, it would be a perversion of the Fourth Amendment to hold that such a suspicion justifies the interruption of that individual's privacy and liberty during any and all of those waking moments.

*Daniel*, 804 F. Supp. at 1335 n.10.

[8] Indeed, the fact of Mendez's gang affiliation generates no more than a generalized "hunch" that he may have committed crimes in the past or that he may be prone to criminal behavior in general, but such hunches fall short of the particularized suspicion that the Fourth Amendment requires. *See Chavez-Valenzuela*, 268 F.3d at 724 ("[A]n inchoate and unparticularized suspicion or hunch cannot withstand scrutiny under the Fourth Amendment." (internal quotation marks omitted)). The fact that Mendez told the officers that he had come to Arizona "trying to get away from the gang life," only further demonstrates the extent to which his statement as to his gang affiliation failed to provide any objective indicium of *ongoing* criminal activity on or about the night in question. We therefore hold that Mendez's gang membership was not, standing alone, a particularized, objective factor that warranted expanding the scope of questioning beyond the initial purpose of the traffic stop. *See id.* at 726.

[9] Because Mendez's gang affiliation was not sufficient to support a reasonable suspicion of criminal activity, Det. Jaensson's continuing interrogation, including his questions regarding Mendez's tattoos, gang activities, or criminal history, exceeded the scope of a permissible Terry-traffic-stop

interrogation. Accordingly, the information obtained as a result of that questioning may not serve as a lawful basis for the questioning subsequently engaged in by Det. Bracke.

### 2. Det. Bracke's questioning of Mendez regarding the reason for his prior prison sentence

The government contends that Det. Bracke was permitted to expand the scope of questioning beyond that ordinarily permitted in connection with a traffic stop on the basis of a combination of two "particularized, objective" factors: (1) Mendez's gang affiliation with the Latin Kings, and (2) Mendez's statement that he had served time in prison.[14] In order to assess this claim, we must determine whether the officers obtained the information regarding these two factors lawfully and, if so, whether the information obtained gives rise to reasonable suspicion of criminal activity.

We have already explained that, questionable or not, we will assume that the information regarding the Latin Kings was lawfully obtained, but that gang membership standing alone is insufficient to give rise to reasonable suspicion of particularized criminal conduct. We have also explained that the information that Mendez had served a prison sentence was obtained unlawfully, during the course of Det. Jaensson's unwarranted interrogation. The result is, therefore, that in this case the combination of the two factors cannot provide a sufficient lawful basis for Det. Bracke's questioning of Mendez regarding the nature of his prison sentence. Nor, or course, for the differing reasons we have explained, can either factor standing alone.

We need not rely, however, for our conclusion that Det. Bracke's questioning was unlawful solely on our determina-

---

[14]The government does not seriously contend that Det. Bracke's questioning was "reasonably related to the justification for the stop." *Chavez-Valenzuela*, 268 F.3d at 724.

tion that the information regarding Mendez's prison sentence was obtained in violation of the Fourth Amendment. Alternatively, we reject the government's contention that the fact of Mendez's former prison sentence and his past or present gang membership, taken together (even if such information were obtained lawfully) created a reasonable suspicion that justified Det. Bracke's questioning.[15] In considering whether the two factors together could serve to justify Det. Bracke's expanded questioning of Mendez, "[w]e must consider these factors first separately, and then cumulatively."[16] *Perez*, 37 F.3d at 514.

---

[15]The circumstances of the stop provided no additional support for a reasonable suspicion of criminal wrongdoing at the time of Det. Bracke's questioning. When Det. Bracke questioned Mendez about the reason for his prison term, he had already determined that he had a valid driver's license and that his vehicle registration had expired only eight days earlier. Indeed, Det. Bracke testified that he returned to the curb with the intention of telling Mendez that his registration had expired. At oral argument, the government acknowledged that when Det. Bracke questioned Mendez, he was investigating possible current criminal activity solely on the basis of the two newly discovered facts that Mendez had acknowledged during the course of Det. Jaensson's interrogation — his gang membership and his earlier prison term.

[16]Our assessment of each question based on information available at the time it was asked is not contrary to the Supreme Court's mandate that we look at the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 274-76 (2002). *Arvizu* involved a single decision by the police to stop a vehicle. *Id.* at 277-78. All of the information used by the Court in the totality inquiry was available at the time of the stop. *Id.* at 277. This case, in contrast, involves a number of challenged police actions occurring sequentially. In such a situation, the totality of the circumstances inquiry logically applies only to circumstances known at the time of each respective police action. This is clear because whether an officer acted on the basis of a reasonable suspicion cannot be determined using information he discovers subsequently. Moreover, *Arvizu*'s requirement that we consider all the information available at the time of the action was in relation to information that was acquired legally. *Id. Arvizu* in no way suggests that unlawfully obtained evidence may be used to establish reasonable suspicion.

We have already concluded above that gang membership alone is not sufficient. *See supra* Part A.1. Similarly, we have previously held in other cases that "a prior criminal history cannot alone establish reasonable suspicion." *Burrell v. McIlroy*, 423 F.3d 1121, 1124 n.3 (9th Cir. 2005); *see also United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir. 2005) ("[A] prior criminal history is by itself insufficient to create reasonable suspicion."); *Padilla v. Miller*, 143 F. Supp. 2d 453, 470 (M.D. Pa. 1999) (holding that the facts that a motorist "had a criminal record and was travelling on an interstate highway . . . are not sufficient to create an objective basis for extending the scope of the traffic stop to a *Terry* investigative detention").

**[10]** While knowledge of prior criminal activity combined with certain other factors may in some circumstances foster a reasonable suspicion of current criminal activity, and while such knowledge may sometimes be taken into account when an officer considers whether there is a basis for reasonable suspicion, the fact of a prior prison term alone does not suffice. As another circuit has correctly observed,

> If the law were otherwise, any person with any sort of criminal record— or even worse, a person with arrests but no convictions — could be subjected to a *Terry*-type investigative stop by a law enforcement officer at any time without the need for any other justification at all. Any such rule would clearly run counter to the requirement of a *reasonable* suspicion . . . .

*United States v. Sandoval*, 29 F.3d 537, 543 (10th Cir. 1994). In short, to rely on Mendez's prior prison term as the *sole* basis for suspecting him of present criminal activity would be to rely on the very sort of "inchoate and unparticularized suspicion or 'hunch' " that the Fourth Amendment forbids.[17]

---

[17]Some individuals with prior convictions may be on probation or parole and thus subject to special searches or restraints without reasonable

*Terry*, 392 U.S. at 27. Accordingly, in the absence of other factors, Mendez's prior prison term is not a sufficiently "particularized, objective" factor "to justify the extended detention and inquiry into other criminal activity." *Chavez-Valenzuela*, 268 F.3d at 724, 726.

*The Factors Considered Cumulatively*[18]

Having concluded that neither factor, considered individually, would be sufficient to justify Det. Bracke's questioning (even if the information regarding both had been lawfully obtained), we must now decide whether "taken together they [would] amount to reasonable suspicion." *United States v. Sokolow*, 490 U.S. 1, 9 (1989). Although "in some circumstances the sum may amount to more than its parts[,] [t]he facts presented in this case . . . whether viewed alone or in combination, amount to little." *United States v. Jones*, 269 F.3d 919, 929 (8th Cir. 2001).

In *United States v. Perez*, we held that six factors — the defendant's nervous appearance, avoidance of eye contact, and profuse perspiration, combined with the fact that he was not the vehicle's registered owner, was heading to a known "drug hub," and had well-manicured hands despite claiming to be a mechanic — "[t]aken together, . . . amount to reasonable suspicion" sufficient to justify the officer's broadening his line of questioning. 37 F.3d at 514 (quoting *Sokolow*, 490 U.S. at 9). Similarly in *United States v. Baron*, 94 F.3d 1312, 1319 (9th Cir. 1996), we held that six factors, "[w]hen considered cumulatively . . . justified additional questioning" regarding drug activity during a traffic stop. The six factors

suspicion. Such persons' Fourth Amendment rights may be limited. *See Samson v. California*, 126 S. Ct. 2193 (2006). The same is not true for persons who have served their time and fully paid their debt to society.

[18]In light of this section, it is unclear why the dissent argues that we fail to consider the factors cumulatively.

identified in *Baron* were: (1) the vehicle did not belong to the defendant, (2) the defendant could not name the registered owner, (3) the defendant provided inconsistent stories regarding his travel from California to Phoenix, (4) the "inside of the vehicle looked too clean and contained no personal belongings," (5) there was an "overpowering cherry smell coming from inside the car," and (6) the defendant appeared nervous. *Id.*; *see also Murillo*, 255 F.3d at 1174 (holding that five factors — extreme nervousness, lack of eye contact only when asked about drug activity, inability to explain travel plans, elevated heart rate, and evidence of long road trip in a rental car — were sufficient to justify broadening the scope of questioning).

[11] Unlike in *Perez*, *Baron*, and *Murillo*, in which the government cited five or six suspicious factors, all of which involved the defendant's conduct during the stop, and all of which raised suspicions of a particular form of present criminal activity, drug trafficking, here the government cites only two factors, neither of which involved suspicious conduct on Mendez's part immediately prior to or during the course of the traffic stop and neither of which suggests current involvement in any particular type of crime.[19] When taken together, the two facts that Mendez is a "former gang member" and a "convicted felon" indicate nothing more than that Mendez had a troubled past. They simply do not provide a particularized, objective basis upon which to infer that Mendez "is, or is about to be, engaged in criminal activity." *Cortez*, 449 U.S. at 417.

---

[19]As explained above, *see supra,* note 16, in this case the circumstances justifying the stop are not probative of criminal activity and, thus, the government does not rely on such factors. Moreover, during the stop, Mendez was forthcoming in his answers to the officers' questions, lawful and unlawful, and exhibited no signs of nervousness until after he was asked the final question, whether he had any weapons in the car. That question, we hold, was unlawful because it was the product of, as well as a part of, an unlawful interrogation exceeding the scope of the Terry stop. Thus, the government properly does not rely on Mendez's conduct during the course of the stop to justify the expanded interrogation.

Many individuals with prior convictions are presently, or were at one time, gang members and vice versa — that is hardly an unusual combination. To hold that the fact that an individual was previously convicted of a crime, and was or is a gang member, is sufficient cause to interrogate him about general criminal activity whenever he may be subjected to a *Terry* stop would infringe upon the fundamental constitutional rights of many currently law-abiding citizens. Although persons who have committed crimes may be afforded lesser Fourth Amendment rights while on probation or parole, once that process is completed and their debt to society has been fully paid, they are entitled to the same protection against unreasonable searches and seizures as all other individuals.[20]

**[12]** We therefore conclude that, considering the two factors together, they do not constitute sufficiently "particularized" and "objective" indicia that give rise to reasonable suspicion that Mendez was engaged in criminal activity at or about the time of the stop. *See Chavez-Valenzuela*, 268 F.3d at 726. Accordingly, even if the fact that Mendez previously served a prison sentence were to be considered (notwithstanding our conclusion that the officers obtained that information as the result of an unlawful interrogation), Det. Bracke's additional questioning about matters unrelated to the purpose of the traffic stop exceeded the scope of a permissible Terry-type

---

[20]Our holding is entirely consistent with our decision in *Michael R*., 90 F.3d 340, in which we upheld an investigatory stop of a vehicle. In that case, we found that the fact that young men in the car "had haircuts that were characteristic of gang members has evidentiary significance under the totality of the circumstances analysis." *Id.* at 346. We have held that gang membership may be a factor when other circumstances that are themselves inherently suspicious exist. In *Michael R*., officers based their investigatory stop on *five* other factors in addition to the gang-style haircuts. *Id.* There, we determined that the "clincher" was the fact that, prior to being pulled over, the young men had engaged in a "street game of cat and mouse" that caused the plainclothes officer who was driving an unmarked car to fear that he was in physical danger. *Id.* at 346-47. By contrast, here, Mendez does not question the stop and, concededly, engaged in no suspicious or threatening behavior.

inquiry and violated the Fourth Amendment. The fruits of that unlawful questioning must be suppressed.

B.   *Officer Safety*

Perhaps recognizing the lack of reasonable suspicion of ongoing criminal activity, the dissent, unlike the government, abandons the district court's basis for justifying the interrogation and search and proposes an entirely different reason for the intrusion on Mendez's rights. The district court dismissed the officer safety argument in a footnote, saying that the officer safety concerns did not eliminate the reasonable suspicion requirement, and then deciding that a reasonable suspicion of criminal activity was present. The dissent, however, relies exclusively on officer safety concerns to justify Det. Bracke's questioning. Its reliance on this new ground is surprising given the paucity of evidence in the record supporting any such concern and, more important, given that the government failed to raise the issue of officer safety on appeal.

The dissent asks us to reach the issue of officer safety because "the court may affirm on any ground fairly supported by the record." In doing so, it disregards the fact that the government did not present the officer safety issue on appeal. Our authority to affirm the district court on alternative grounds does not excuse the parties from their obligation to brief the issues they wish the court to consider. *See, e.g.*, *Scholar v. Pac. Bell*, 963 F.2d 264, 266 (9th Cir. 1992) (explaining that we ordinarily affirm on alternative grounds only if the issue is briefed by the parties); *United States v. Lewis*, 787 F.2d 1318, 1323 n.6 (9th Cir.), *as amended on denial of reh'g and reh'g en banc*, 798 F.2d 1250 (9th Cir. 1986) (reversing a conviction and declining to reach grounds first raised by the government in its petition for rehearing). If the court reaches an issue not briefed by the concerned party, the opposing party is deprived of the opportunity to respond and the court is deprived of the benefit of briefing. *Galvin v. Alaska Dep't of Corr.*, 397 F.3d 1198, 1204 (9th Cir. 2005). Thus, "gener-

ally courts limit themselves to resolving the issues that the parties put before them, as opposed to the issues they spot outside what the parties elect to raise." *Id.* at 1204. This is particularly true where the failure was intentional, as opposed to inadvertent. *Varney v. Sec'y of Health and Human Servs.*, 859 F.2d 1396, 1397-98 (9th Cir. 1988). Even *United States v. Baron*, upon which the dissent relies, affirmed on grounds presented on appeal by the prosecution. *Baron*, 860 F.2d at 913.

A party seeking to raise an issue must include that issue in its brief, setting the issue forth in the brief's "contentions [along with] the reasons . . . , with citations to the authorities" and the record. FED. R. APP. P. 28(a)(9)(A), (b). This the government completely fails to do. The brief mentions officer safety only once, in its "Facts" section, where it reports that Mendez was asked to sit on the curb during the stop (leaving three small children alone in his car) because of officer safety. It does not mention the subject again and does not refer even once to officer safety in the "Argument" section of the brief. Nor does it cite to any authority on the officer safety issue. Indisputably, the government did not seek on appeal to justify the questioning or the search on officer safety grounds. As a result of the government's failure to raise the issue, the defendant did not have the opportunity to respond to the arguments that the dissent now offers on the government's behalf.

It is likely that the government refrained from raising the officer safety issue on appeal in part, at least, because it believed that officer safety did not justify the questioning here. At oral argument, the government acknowledged that its entire case rose or fell on whether Mendez's gang membership and prior imprisonment created reasonable suspicion of criminal activity sufficient to justify Det. Bracke's additional and unrelated questioning.[21] In addition, the government's

---

[21]The discussion at oral argument included the following:

unwillingness to raise the issue is not surprising as the circumstances make it plain that the interrogation was not motivated by safety concerns. When the officers took Mendez out of his car and frisked him,[22] they did not seek to discover

| The Court: | So why was it necessary, what was the totality of the circumstances that justified the further questioning about why were you in prison and do you have a gun in the car? |
|---|---|
| The Government: | Well that came about first from asking him, "Where are you from?" and instead of saying "I am from Chicago or I am from Los Angeles," "I'm from the Latin Kings" which is a suspicious answer in itself. They followed up on that question or he actually followed up and volunteered not only am I from the Latin Kings but I've spent time in prison . . . . So investigating that further line of questioning, based on that new reasonable suspicion . . . . |

This exchange was shortly followed by:

| The Court: | Your position is that the issue in the case is if a man has gang symbols on and he's been in prison, that gives you particularized suspicion? |
|---|---|
| The Government: | Yes, that's what the district court found, that the fact — yes, yes, that that is, that is the position, yes your Honor, yes. |
| The Court: | And if we decided that was not, those facts did not give rise to particularized suspicion, you would lose? |
| The Government: | I believe so. Yes. |

Although it is true, as the dissent notes, that, in response to a suggestion originating with our dissenting colleague, government counsel made a brief allusion to officer safety during the oral argument, the reference is far from sufficient to resurrect the issue that it abandoned in its briefs, especially given its reiteration of the issue that it acknowledged *was* before the court.

[22]Mendez does not challenge this frisk, so we do not consider whether it could be justified by officer safety concerns. We note, however, that his failure to challenge the frisk does not, as the dissent argues, amount to a concession that the frisk is justified by officer safety concerns. Rather, it is most likely due to the fact that nothing was found in the frisk and, as a result, there is no need for Mendez to argue that the fruits of the frisk should be suppressed.

whether he had any weapons in his car. Instead, they seated him on the curb and interrogated him about his gang membership, tattoos, and other matters. Only later, in the course of conducting the unlawful investigation, did they learn of his prior conviction, several years before, on a weapons charge and on the basis of that information ask him whether he was currently committing a felony — felon in possession of a gun. Thus, the context of the questioning clearly demonstrates its investigatory nature. Given all these circumstances, a judgment on the part of the government not to raise officer safety on appeal would not be unreasonable. Moreover, even though the defendant in his brief referred to the issue briefly, noting that the government might choose to raise officer safety in its answering brief, the government failed to do so. All of these circumstances make it apparent to us that the government's choice was deliberate.

We note that this is not an instance in which we are justified in deciding an issue not raised by the parties in order to avoid incorrectly interpreting the law. We do not create any incorrect precedent by refraining from reaching the officer safety issue in this case. Nor do we create any intra- or inter-circuit conflict. We simply preserve an issue for another day.

**[13]** For the above reasons, we decline to consider the officer safety issue on this appeal. We need not decide here whether we could, in our discretion, overlook the government's decision not to raise the issue before us. Given all of the facts and circumstances we have described above, we simply determine that to the extent such discretion exists, this is not an appropriate case in which to exercise it.

We fully appreciate the importance of officer safety and agree that officers should have the ability to take necessary steps to protect themselves. For this reason, we note that even were we to reach the question of officer safety on the merits, we would be confronted with a number of questions similar

to those that required us to exclude the evidence under Part A., *supra*.

## III. CONCLUSION

We hold that, because the fact of gang membership is not sufficient to generate a particularized, reasonable suspicion of criminal activity, Det. Jaensson was not justified in expanding his questioning of Mendez to topics beyond the scope of the traffic stop. Even if the officers could also have considered that Mendez had once served a prison sentence, this information, either alone or in combination with the information regarding gang membership, does not give rise to the requisite type of particularized suspicion necessary to expand the scope of the interrogation. The dissent suggests that we consider affirming the district court on the alternative ground of officer safety. We decline to do so, as that issue was not raised or briefed before us by the government.

**[14]** Thus, we conclude that Mendez's Fourth Amendment rights were violated when he was subjected to interrogation by the officers that exceeded the scope of the traffic stop. Accordingly, the handgun seized from the car must be suppressed as the product of this unlawful questioning. *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). We therefore reverse the district court's denial of the motion to suppress, vacate the conviction, and remand for further proceedings consistent with this opinion.

VACATED and REMANDED.

---

TALLMAN, Circuit Judge, dissenting:

Here we go again. The Supreme Court has told us repeatedly that the Fourth Amendment protects against *unreasonable* searches and seizures. *United States v. Arvizu*, 534 U.S.

266, 273 (2002); *Ohio v. Robinette*, 519 U.S. 33, 39 (1996); *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). It does not declare inviolate the sanctity of a suspect's personal security when a police officer has reasonable concerns for his safety. In *Terry v. Ohio*, 392 U.S. 1 (1968), the Court recognized that an officer may take reasonable measures to thwart the ability of a suspect deemed to be potentially armed and dangerous from harming the officer or innocent bystanders. *Id.* at 23; *see also Michigan v. Long*, 463 U.S. 1032, 1034, 1047 (1983); *United States v. Willis*, 431 F.3d 709, 717 (9th Cir. 2005); *United States v. $109,179 in U.S. Currency*, 228 F.3d 1080, 1086 (9th Cir. 2000); *United States v. Portillo*, 633 F.2d 1313, 1320 (9th Cir. 1980).

The Supreme Court says we must look to the "totality of the circumstances" in order to determine whether the officers' actions were reasonable under the Fourth Amendment. *Robinette*, 519 U.S. at 39 (stating that "the touchstone of the Fourth Amendment is reasonableness" and "[r]easonableness . . . is measured in objective terms by examining the totality of the circumstances" (internal quotation marks and citation omitted)). The Court unanimously rejected as "contrary to our prior decisions" the "divide-and-conquer" technique employed by the Ninth Circuit in *United States v. Arvizu*, 232 F.3d 1241 (9th Cir. 2000), *rev'd*, 534 U.S. at 268, 274, to rebuff the officer's reasonable suspicion. Yet, once again the majority reverts to this discredited device to pick apart every justification for the officers' actions and declares unconstitutional questions critical to an officer's safety. In doing so, the majority fails to view the evidence in the light most favorable to the district court's decision to uphold the seizure of the weapon. *See United States v. Harrington*, 636 F.2d 1182, 1185 (9th Cir. 1980). I respectfully dissent.

I

*Terry* tells us that we employ a two-pronged analysis to field interviews: (1) is there reasonable suspicion that criminal

activity is afoot to justify further police inquiry, and (2) can the officers articulate reasons to fear the suspect may be armed, thereby justifying action to ensure the officer's safety. *See* 392 U.S. at 21-22, 27. Phoenix Gang Enforcement Detectives Carl Jaensson and Jim Bracke were patrolling an area of high gang activity.[1] The stop occurred at night in a gang neighborhood and Detective Jaensson immediately ordered Mendez out of the vehicle and patted him down for weapons. Mendez does not challenge the reason for this lawful investigatory stop—he had failed to display a valid Arizona license plate with a current registration tag. Nor does Mendez challenge the lawfulness of this pat-down frisk—the detectives' testimony that they reasonably feared for their safety was undisputed. It was during the pat-down that Detective Jaensson first noticed a gang-related tattoo located on Mendez's left hand. Based on his eight years of experience as a gang-enforcement detective, he readily recognized this tattoo as the insignia of a well-known and violent street gang, the Latin Kings.

---

[1]During the motion to suppress hearing, defense counsel admitted to the court that the officers had pulled Mendez over in a "gang neighborhood." The colloquy between the court and defense counsel went as follows:

> COURT: I don't think - - I'm not sure that the Government even argues this, but if you're on gang duty, as they were, in a gang neighborhood, as they were, and admittedly they make a traffic stop of this type, now they discover that the driver has a gang symbol, volunteers that he came from a gang, doesn't that - - doesn't that sequence entitle them to expand the scope further on the strength of those two points?

> DEFENSE COUNSEL: But expand the scope in what direction? . . . You identified the factors immediately, Judge. Th[e]se [are] gang officers patrolling a gang neighborhood, contending that they pulled Mr. Mendez over to investigate his lapsed registration.

In response to this colloquy, the prosecutor followed up by arguing that the detectives' questions were justified by a reasonable concern for their own personal safety. *See infra* § III.

Although he found no weapons on Mendez's person, Detective Jaensson did not permit him to return to his vehicle at that time; rather, Detective Jaensson ordered Mendez to sit on the curb while Detective Bracke returned to their police car to run a computer search. When asked at the motion to suppress hearing why he ordered Mendez to sit on the curb, Detective Jaensson answered, "For our safety . . . so that [he] would have a harder time getting up and attacking us if that was [sic] to happen." Mendez does not challenge this decision.

Detective Jaensson knew that the Latin Kings were a Chicago-based gang; yet, Mendez had provided a California identification card, and the car he was driving had an expired temporary registration from Arizona. While awaiting the results of Detective Bracke's records search, Detective Jaensson asked Mendez where he was from.[2] Rather than responding with a specific location, Mendez told Detective Jaensson that he was from the Latin Kings. Contrary to the majority's

---

[2]Mendez contends that the detectives were not justified in asking him where he was from, and, although the majority does not hold as such, it "doubt[s] that this question was related to the purpose of the stop." Maj. op. 18029. The Fourth Amendment surely does not prohibit such relevant and innocuous questions when police are investigating a person operating a vehicle in violation of the law and the circumstances show multiple state contacts. The Supreme Court tells us that during even a routine traffic stop an "officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *see also United States v. Hill*, 195 F.3d 258, 268 (6th Cir. 1999) (holding questions about a driver's "purpose for traveling" were reasonably related to a traffic stop for speeding). Any concern the majority may have over the detectives' subjective intent is misplaced and irrelevant. *See Wren v. United States*, 517 U.S. 806, 812 (1996) (stating that, in *United States v. Villamonte-Marquez*, 462 U.S. 579, 584 n.3 (1983), the Court "flatly dismissed the idea that an ulterior motive might serve to strip the agents of their legal justification" in conducting an otherwise valid warrantless search); *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996) ("Under *Wren*, [defendant] is precluded from challenging the traffic stop based on [the officer's] subjective intent.").

position, the record does not suggest that Detective Jaensson continued to "interrogate" or "question" Mendez about his gang-related activity. Indeed, the majority cannot conclusively state that any one question was unlawful because there is no clear indication from the record as to how the conversation between Detective Jaensson and Mendez proceeded. Detective Jaensson testified that he had asked Mendez to show him the rest of his tattoos but that he could not recall any specifics from their discussion about those tattoos, other than Mendez telling him that he had left the Illinois gang in "good standing" and that he was trying to make a life for himself now in Arizona.

When Detective Bracke returned, he overheard Mendez tell Detective Jaensson that he had spent eight years in an Illinois prison. Detective Bracke then asked Mendez, "Why were you in prison?"[3] Once Mendez answered that he was in prison on a weapons violation, Detective Bracke immediately followed up with the question, "Do you have any weapons in your car?"

During the evidentiary hearing on the motion to suppress the gun, Detective Jaensson was asked, "Why was it important to inquire as to whether [Mendez] had a weapon once you had received the information he had given you?" Detective Jaensson gave a common-sense response—for officer safety:

> Basically, it's again for our safety. When Mr. Mendez, if he's released, if we issue him a citation and he's upset, if he goes back to his vehicle and there's a weapon there, we might have a problem with our safety.

---

[3]Although the police report suggests that Mendez volunteered the information as to why he was in prison, Detectives Jaensson and Bracke both testified that Detective Bracke may have asked him directly. Because the district court failed to resolve this factual discrepancy, and because the detectives were justified in asking him this question for their own safety in any event, I will assume that Mendez did not volunteer this information.

Then, when asked by defense counsel whether the weapons-related questions had anything to do with the purpose of the initial traffic stop, Detective Jaensson unequivocally responded, "Yes." He explained:

> Because my policy is I'm going home at night, I want to make sure that me and my partner are going to be safe, and the people that we stop a lot of times will have guns so the bottom line for me is if they have a gun I want to know about it so that I am safe and my partner is safe.

Detective Jaensson's undisputed testimony was that ensuring officer safety was the sole reason Detective Bracke asked Mendez if he had a weapon in his car.

Only eight minutes elapsed from the initial stop to the arrest of Mendez for unlawful possession of the firearm. Eight minutes is hardly an unreasonable detention in violation of the Fourth Amendment when there is no challenge to the legitimacy of the initial stop. Yet, the majority finds that safety-related questions prompted by admissions volunteered by Mendez were constitutionally impermissible.

## II

The Court's opinion seeks to pigeonhole the facts of this case into the first prong of the *Terry* analysis—concerning investigatory stops and limitations on questions related to the purpose of those stops—and ignores any concern over officer safety, undeniably a substantial concern for Detectives Jaensson and Bracke and one which the Supreme Court has repeatedly validated. *See, e.g.*, *Long*, 463 U.S. at 1049. The majority concludes that the detectives unlawfully expanded the scope of the initial stop by asking Mendez (1) about his gang-related tattoos, and (2) why he was in prison.[4] The

---

[4]I agree that Mendez waived his state law claim by failing to raise it before the district court. Maj. op. 18027 n.9.

majority's decision erroneously focuses on its belief that the two factors—gang affiliation and former prison service—did not provide particularized, objective factors suggesting that Mendez was currently engaged in criminal activity. By doing so, the majority entirely disregards the second prong of *Terry* and an independent justification for the detectives' actions: prior gang affiliation and former prison service did give the detectives a reasonable basis to fear for their safety, permitting further inquiry.

The majority relies heavily on our prior decision in *United States v. Chavez-Valenzuela*, 268 F.3d 719 (9th Cir. 2001). There, we held that nervous behavior on the part of a *Terry* suspect detained for a traffic violation did not give the officer reasonable, particularized suspicion to ask the suspect about possible drug-related activity. *Id.* at 726. We stated that "[q]uestions asked initially during a traffic stop must be reasonably related to the justification for the stop," *id.* at 725 n.4, and an officer may expand the scope of questioning beyond the stop's initial purpose "only if he notices particularized, objective factors arousing his suspicion" of criminal activity, *id.* at 724. However, *Chavez-Valenzuela* is inapposite to this situation because Detectives Jaensson and Bracke did not expand the scope of the investigatory stop, and, while diligently investigating the unchallenged reason for the stop, the detectives learned facts about Mendez that caused them reasonably to fear for their safety.

The majority's incongruous conclusion that Detective Jaensson exceeded the limits of his constitutional authority by eliciting information about Mendez's tattoos is simply unsubstantiated by any Ninth Circuit or Supreme Court authority. First and foremost, the facts that Mendez presented a California identification card rather than a valid driver's license, was driving a car with an expired Arizona temporary registration tag, and said he was from the Latin Kings, which Detective Jaensson knew to be a Chicago-based gang, is most certainly relevant to the totality of the circumstances analysis. It was

reasonable for Detective Jaensson to ask Mendez about his tattoos in order to elicit general information about his gang activity and to try to discern what Mendez was doing in Phoenix that night.

The Fourth Amendment does not require reasonable suspicion to be based solely on factors that directly indicate criminal behavior. *Arvizu*, 534 U.S. at 273-75; *United States v. Sokolow,* 490 U.S. 1, 9 (1989) ("Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion."); *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996) (same). Furthermore, the lack of a valid registration also gives rise to a reasonable suspicion that the vehicle could have been stolen. *United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994) ("[The] lack of a valid registration, license, bill of sale, or some other indicia of proof to lawfully operate and possess the vehicle in question . . . giv[es] rise to objectively reasonable suspicion that the vehicle may be stolen.").

At the time of Detective Jaensson's alleged "interrogation," Detective Jaensson knew that Mendez was driving a vehicle without license plates and that he was a member of the Latin Kings.[5] These facts support a reasonable suspicion that the vehicle may have been stolen. *Cf. United States v. Thompson*, 282 F.3d 673, 678 (9th Cir. 2002) (finding reasonable suspicion that a vessel may have been stolen when the defendant was unable to provide a valid registration, the vessel's registration sticker had expired, and the defendant could not remember the name of the vessel's owner). Therefore, because Detective Jaensson did have reasonable suspicion that criminal activity could be afoot, any questions he might have asked Mendez in order to elicit information regarding

---

[5]Detective Jaensson testified that at the time of the traffic stop he "could not see a temporary registration tag." The record is unclear as to whether he noticed the expired tag as he approached the car.

possible gang activity—subsequent to Mendez's volunteering that he had served a prior prison term—were constitutionally permissible. As such, Detective Jaensson lawfully obtained the information regarding Mendez's prior prison service.

Moreover, asking the reason for the prison sentence was not improper as the detectives understandably inquired further for their own safety upon learning they had stopped a convicted felon. Under *Terry*, when an officer has a reasonable basis to fear for his or her safety, the Fourth Amendment does not "deny th[at] officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." 392 U.S. at 24. The issue then becomes "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27.

If an officer has a reasonable basis to fear for his safety, he may ask questions to elicit information in an attempt to determine whether the suspect may be armed and dangerous. *Willis*, 431 F.3d at 717. In *Willis*, the officer watched as the suspect made a succession of rapid turns, and stopped in front of an apartment building in a high-crime area of Las Vegas. *Id.* at 712. After the officer ran a check on the suspect's license plate, he learned that "the car was listed as a 'suspicious vehicle' and that there was a National Crime Information Center . . . missing person's report or 'hit' associated with the license plate." *Id.* The suspect then returned to his car, made an illegal U-turn, and parked in front of another apartment only one or two blocks away; at this point an officer pulled the suspect over. *Id.* After the suspect nervously exited his car, the officer ordered him to go to the front of the vehicle and asked, "Do you have anything on you I should know about?" *Id.* The suspect admitted to having a gun in his jacket pocket, *id.*, and we upheld the validity of the investigatory stop and the officer's questions, *id.* at 715, 717. We stated that "[o]nce the police stopped [the suspect], they could, within reason, search the area and question [him] about

weapons for their own safety." *Id.* at 717. We also noted that "[the officer] did not take more extreme measures, but simply asked [the suspect] a question to ensure the officers' personal safety." *Id.*

Even assuming *arguendo* that gang affiliation and former prison service did not present particularized, objective factors sufficient to raise a reasonable suspicion of *current* criminal activity in order to justify the question, "Why were you in prison?" knowledge of Mendez's gang membership and prior weapons conviction surely gave Detectives Jaensson and Bracke a reasonable basis to fear for their safety. Given the time of night and the location of the stop, Mendez concedes that Detectives Jaensson and Bracke acted reasonably by ordering him out of the vehicle and immediately patting him down for weapons. The reasonable fear that caused the detectives to take that approach did not dissipate once they learned that Mendez was a member of the Latin Kings. *See United States v. Barboza*, 412 F.3d 15, 15-16 (1st Cir. 2005) (upholding the legality of a protective search when the officers encountered a "suspected gang member[ ] on a street . . . known for gang violence" and had reason to believe that the suspect was a "gang-affiliated individual who routinely carried a firearm"); *Michael R.*, 90 F.3d at 346 ("[T]he fact that the young men had haircuts that were characteristic of gang members has evidentiary significance under the totality of the circumstances analysis.").[6] It was certainly not diminished

_____

[6]The majority's reliance on *Spivey v. Rocha*, 194 F.3d 971 (9th Cir. 1999), to support its position that gang affiliation does not raise reasonable suspicion as to whether a suspect may be carrying a weapon is misplaced. There, while reviewing a state court conviction, we held that the trial court's failure to admit "evidence of [the witness's] gang affiliation to bolster [the defendant's] assertion that he armed himself in self-defense" was not constitutional error. *Id.* at 977-78. We reasoned that "the tendency of members of a gang to carry weapons does not lead reasonably to any inference as to whether a gang member was armed on a given occasion," and, furthermore, any probative value it may have "was outweighed by the prejudicial effect of admitting gang affiliation." *Id.* at 978 (internal quota-

when Mendez volunteered that he was an ex-convict, having previously served an eight-year prison term in Illinois.

As the Fourth Circuit stated in *United States v. Holmes*, 376 F.3d 270 (2004), "reasonable suspicion of a suspect's danger-ousness need not be based solely on activities observed by the police during or just before the relevant police encounter, but can be based on the suspect's commission of violent crimes in the past—especially when those crimes indicate a high likelihood that a suspect will be 'armed and dangerous' when encountered in the future."[7] *Id.* at 278; *see also $109,179 in U.S. Currency*, 228 F.3d at 1086 (an officer can assume "from the nature of the offense contemplated" that a suspect may be armed and dangerous). This information can only have heightened their suspicion that Mendez might have a weapon in his car, and the Fourth Amendment's reasonableness requirement demands nothing more. After hearing Mendez admit to gang affiliation and a felony conviction for which he had served eight years in prison, the detectives "could . . . question [Mendez] about weapons for their own safety." *See Willis*, 431 F.3d at 717.

---

tion marks omitted). Equating the admittance of evidence for the purpose of trial to the circumstances faced by Detectives Jaensson and Bracke in the field—when their personal safety was at stake—is perverse. *See United States v. Feliciano*, 45 F.3d 1070, 1074 (7th Cir. 1995) (recogniz-ing that while gang association has "doubtful *evidentiary* value" it none-theless is "a permissible component of the articulable suspicion required for a *Terry* stop"). Under the totality of the circumstances, it was reason-able for the detectives to fear for their safety. In those circumstances, gang affiliation coupled with an eight-year prison term on a weapons charge supports a reasonable suspicion that a particular individual may be armed and dangerous.

[7] I note here that Detective Bracke merely asked Mendez why he was in prison, suggesting that Detective Bracke's intent was not to investigate current criminal activity, but to gauge the safety threat posed by Mendez to the detectives based on their understandable desire to know more about the formerly imprisoned person with whom they were dealing.

Detective Bracke did not ask Mendez these questions to investigate ongoing criminal activity; instead, he asked these questions in order to determine whether there was a reason to subject Mendez to a more intrusive safety search—a protective sweep of his vehicle. *See Barboza*, 412 F.3d at 16 ("The purpose of a protective search in the absence of probable cause is not to discover evidence of a crime, but to neutralize the threat of physical harm to police officers and others."). When an officer believes that a suspect may be armed and dangerous, it is not unreasonable for that officer to "tak[e] preventive measures to ensure that there were no other weapons within [the suspect's] immediate grasp before permitting him to reenter his automobile." *Long*, 463 U.S. at 1051. As recognized by the Seventh Circuit in *United States v. Rainone*, 586 F.2d 1132 (7th Cir. 1978), there are inherent differences between a *Terry* stop executed on the sidewalk and one executed while the suspect is in an automobile:

> Obviously in a sidewalk encounter with a pedestrian, such as occurred in *Terry*, the officer's need to protect himself from dangerous weapons is fully satisfied by a pat-down of outer clothing of the suspect. However, where the suspect is driving an automobile, a pat-down of the outer clothing may not be sufficient to assure the safety of the police officer. In those cases there is the real possibility that a weapon may have been secreted in a part of the automobile readily accessible to the suspect. This is particularly true where the suspect remains in the car, but is also true even where the suspect has been removed from the car. In the latter instance there is still a risk that the suspect may break away or that he may have a motive to kill the officer even after returning to his car. Thus, it is clear that [under] the rationale of *Terry* the protection of the investigating officer and others nearby permits the officer to make a search of the automobile, limited to what is minimally neces-

> sary to uncover weapons to which the suspect will
> have easy access.

*Id.* at 1134-35 (footnotes omitted), *cited with approval in Long*, 463 U.S. at 1051 (stating that it is not impossible for a "*Terry* suspect . . . [to] break away from police control and retrieve a weapon from his automobile"); *see also United States v. Wilkerson*, 598 F.2d 621, 625 (D.C. Cir. 1978) ("It takes little imagination to realize that an armed suspect might hide his weapon in a car before getting out in response to a police order."), *cited with approval in Portillo*, 633 F.2d at 1320.

For these reasons, the Supreme Court has upheld the right of police officers to conduct a limited search of the passenger compartment of an automobile when "the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control over weapons." *Long*, 463 U.S. at 1049-50 (citing *Terry*, 392 U.S. at 21). Although Detective Jaensson had already patted Mendez down for weapons, he still posed a threat to the detectives. *See Long*, 463 U.S. at 1051; *Wilkerson*, 598 F.2d at 625; *Rainone*, 586 F.2d at 1134-35. His answers to Detective Jaensson's questions—that he was a member of the Latin Kings and that he had served an eight-year prison term—failed to dispel the detectives' reasonable suspicion that Mendez might pose a danger to the detectives. *Cf. $109,179 in U.S. Currency*, 228 F.3d at 1086 (finding a *Terry* pat-down to be reasonable because the suspect failed to alleviate the officer's reasonable belief that the suspect was armed and dangerous during the officer's initial questioning).

Because it was entirely feasible that Mendez may have concealed his weapon in his car before the detectives approached his vehicle, and because it was always possible for Mendez to break away from the detectives during the investigatory stop

for fear that his arrest was imminent or to retaliate upon the issuance of a citation, Mendez's threat to the safety of Detectives Jaensson and Bracke never abated. Given the totality of the circumstances, and that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers," *Long*, 463 U.S. at 1047, Detective Bracke's understandable desire to protect himself and his partner so they could go home at the end of their shift was nothing but reasonable.[8]

## III

The majority's refusal to address the officer safety issue makes no sense in light of the record below. Rather than analyzing this case under both prongs of law announced in *Terry* and applying the correct analysis dictated in *Arvizu*, the majority seizes upon a verbal misstep by the government attorney. The approach employed by the majority—limiting its reasonableness analysis to only one justification—is not just another example of what the Supreme Court has unanimously condemned as "divide-and-conquer," but an even more egregious approach of "divide, conquer, and ignore."

Contrary to the majority's position, the government did argue that the detectives' questions were justified by concerns for officer safety. During oral argument, the government stated, "There was an officer safety concern here . . . ." However, before being allowed to finish the answer, the government was pressed by the court with questions regarding

---

[8]Because the detectives' actions were justified and reasonable, Mendez's argument that the detectives unlawfully prolonged the stop is meritless. *See United States v. Sharpe*, 470 U.S. 675, 686 (1985) ("In assessing whether a detention is too long in duration to be justified as an investigative stop, . . . it [is] appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly."). Detectives Jaensson and Bracke were diligent in their investigation, as evidenced by the fact that only eight minutes had passed between the initial stop and Mendez's arrest.

whether gang affiliation and former prison service were suffi-cient to create particularized, objective factors of current criminal activity. In response, the government conceded that those facts would have been the sole basis for the detectives' decision to expand the scope of the investigatory stop; how-ever, the government never conceded that a reasonable suspi-cion of current criminal activity was the sole justification for the detectives' questions. It did try to articulate another justification—officer safety—before being interrupted by questions from the court.

Moreover, "when reviewing a motion to suppress, the court may affirm on any ground fairly supported by the record." *United States v. Baron*, 860 F.2d 911, 917 (9th Cir. 1988) (cit-ing *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986)). During the motion to suppress hearing, the government made the following argument:

> When we think of *Terry* we typically think of do the officers have reasonable suspicion to investigate? But there's more to *Terry* than that. There is also the officer safety issue.
>
> . . . .
>
> The measures taken here to ensure that Mr. Mendez was not armed and did not have access to a weapon were clearly reasonable. It [sic] involved questioning, do you have a weapon in the vehicle, after the officers had specific articulable reasons for asking that question.

The Government also raised this argument in its opposition to the motion to suppress. The district court believed that gang affiliation and former prison service were sufficient to raise particularized suspicion of current criminal activity, and, therefore, it did not rule on the officer safety issue. However, this theory is clearly supported by the evidentiary record, was

expressly argued before the district court, and we are obligated to address it now. We should not be so quick to conclude that the detectives' actions were unconstitutional when it is evident from the record that they acted reasonably to protect themselves under the totality of the circumstances.

IV

The Fourth Amendment does not require police officers to take unnecessary risks in the performance of their duties. Constraining an officer's ability to make further inquiry into a *Terry* suspect's potential dangerousness endangers the officer, his partner, and innocent bystanders, and contravenes established Supreme Court caselaw authorizing the use of reasonable protective measures to ensure officer safety. Two experienced gang-enforcement detectives were confronting a gang member, in a gang neighborhood, who admitted to serving an eight-year prison term on a weapons charge. Faced with such a situation, they made a reasonable decision to make further inquiry into whether Mendez had a gun in his car. The questions they posed were not overly intrusive and were directly related to their legitimate safety concern.

I respectfully dissent.